# LYNCH, MAYOR OF PAWTUCKET, ET AL. *v.* DONNELLY ET AL.

No. 82–1256. Argued October 4, 1983—Decided March 5, 1984

BURGER, C. J., delivered the opinion of the Court, in which WHITE, POWELL, REHNQUIST, and O'CONNOR, JJ., joined. O'CONNOR, J., filed a concurring opinion, *post*, p. 687. BRENNAN, J., filed a dissenting opinion, in which MARSHALL, BLACKMUN, and STEVENS, JJ., joined, *post*, p. 694. BLACKMUN, J., filed a dissenting opinion, in which STEVENS, J., joined, *post*, p. 726.

*William F. McMahon* argued the cause for petitioners. With him on the briefs were *Richard P. McMahon* and *Spencer W. Viner.*

*Solicitor General Lee* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Assistant Attorney General McGrath, Deputy Solicitor General Bator, Deputy Assistant Attorney General Kuhl,* and *Kathryn A. Oberly.*

*Amato A. DeLuca* argued the cause for respondents. With him on the brief were *Sandra A. Blanding, Burt Neuborne, E. Richard Larson,* and *Norman Dorsen.**

CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to decide whether the Establishment Clause of the First Amendment prohibits a municipality

---

*Briefs of *amici curiae* urging reversal were filed for the Coalition for Religious Liberty et al. by *James J. Knicely* and *John W. Whitehead;* for the Legal Foundation of America by *David Crump;* and for the Washington Legal Foundation by *Daniel J. Popeo, Paul D. Kamenar,* and *Nicholas E. Calio.*

Briefs of *amici curiae* urging affirmance were filed for the American Jewish Committee et al. by *Samuel Rabinove;* and for the Anti-Defamation League of B'Nai B'rith et al. by *Justin J. Finger, Alan Dershowitz, Meyer Eisenberg, Jeffrey P. Sinensky, Nathan Z. Dershowitz,* and *Marc Stern.*

from including a crèche, or Nativity scene, in its annual Christmas display.

I

Each year, in cooperation with the downtown retail merchants' association, the city of Pawtucket, R. I., erects a Christmas display as part of its observance of the Christmas holiday season. The display is situated in a park owned by a nonprofit organization and located in the heart of the shopping district. The display is essentially like those to be found in hundreds of towns or cities across the Nation—often on public grounds—during the Christmas season. The Pawtucket display comprises many of the figures and decorations traditionally associated with Christmas, including, among other things, a Santa Claus house, reindeer pulling Santa's sleigh, candy-striped poles, a Christmas tree, carolers, cut-out figures representing such characters as a clown, an elephant, and a teddy bear, hundreds of colored lights, a large banner that reads "SEASONS GREETINGS," and the crèche at issue here. All components of this display are owned by the city.

The crèche, which has been included in the display for 40 or more years, consists of the traditional figures, including the Infant Jesus, Mary and Joseph, angels, shepherds, kings, and animals, all ranging in height from 5″ to 5′. In 1973, when the present crèche was acquired, it cost the city $1,365; it now is valued at $200. The erection and dismantling of the crèche costs the city about $20 per year; nominal expenses are incurred in lighting the crèche. No money has been expended on its maintenance for the past 10 years.

Respondents, Pawtucket residents and individual members of the Rhode Island affiliate of the American Civil Liberties Union, and the affiliate itself, brought this action in the United States District Court for Rhode Island, challenging the city's inclusion of the crèche in the annual display. The District Court held that the city's inclusion of the crèche in the display violates the Establishment Clause, 525 F. Supp. 1150, 1178 (1981), which is binding on the states through the

Fourteenth Amendment. The District Court found that, by including the crèche in the Christmas display, the city has "tried to endorse and promulgate religious beliefs," *id.*, at 1173, and that "erection of the creche has the real and substantial effect of affiliating the City with the Christian beliefs that the creche represents." *Id.*, at 1177. This "appearance of official sponsorship," it believed, "confers more than a remote and incidental benefit on Christianity." *Id.*, at 1178. Last, although the court acknowledged the absence of administrative entanglement, it found that excessive entanglement has been fostered as a result of the political divisiveness of including the crèche in the celebration. *Id.*, at 1179–1180. The city was permanently enjoined from including the crèche in the display.

A divided panel of the Court of Appeals for the First Circuit affirmed. 691 F. 2d 1029 (1982). We granted certiorari, 460 U. S. 1080 (1983), and we reverse.

## II

### A

This Court has explained that the purpose of the Establishment and Free Exercise Clauses of the First Amendment is

> "to prevent, as far as possible, the intrusion of either [the church or the state] into the precincts of the other." *Lemon* v. *Kurtzman*, 403 U. S. 602, 614 (1971).

At the same time, however, the Court has recognized that

> "total separation is not possible in an absolute sense. Some relationship between government and religious organizations is inevitable." *Ibid.*

In every Establishment Clause case, we must reconcile the inescapable tension between the objective of preventing unnecessary intrusion of either the church or the state upon the other, and the reality that, as the Court has so often noted, total separation of the two is not possible.

The Court has sometimes described the Religion Clauses as erecting a "wall" between church and state, see, *e. g.*, *Everson* v. *Board of Education*, 330 U. S. 1, 18 (1947). The concept of a "wall" of separation is a useful figure of speech probably deriving from views of Thomas Jefferson.[1] The metaphor has served as a reminder that the Establishment Clause forbids an established church or anything approaching it. But the metaphor itself is not a wholly accurate description of the practical aspects of the relationship that in fact exists between church and state.

No significant segment of our society and no institution within it can exist in a vacuum or in total or absolute isolation from all the other parts, much less from government. "It has never been thought either possible or desirable to enforce a regime of total separation . . . ." *Committee for Public Education & Religious Liberty* v. *Nyquist*, 413 U. S. 756, 760 (1973). Nor does the Constitution require complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any. See, *e. g.*, *Zorach* v. *Clauson*, 343 U. S. 306, 314, 315 (1952); *Illinois ex rel. McCollum* v. *Board of Education*, 333 U. S. 203, 211 (1948). Anything less would require the "callous indifference" we have said was never intended by the Establishment Clause. *Zorach, supra*, at 314. Indeed, we have observed, such hostility would bring us into "war with our national tradition as embodied in the First Amendment's guaranty of the free exercise of religion." *McCollum, supra*, at 211–212.

## B

The Court's interpretation of the Establishment Clause has comported with what history reveals was the contemporaneous understanding of its guarantees. A significant example

---

[1] See *Reynolds* v. *United States*, 98 U. S. 145, 164 (1879) (quoting reply from Thomas Jefferson to an address by a committee of the Danbury Baptist Association (January 1, 1802)).

of the contemporaneous understanding of that Clause is found in the events of the first week of the First Session of the First Congress in 1789. In the very week that Congress approved the Establishment Clause as part of the Bill of Rights for submission to the states, it enacted legislation providing for paid Chaplains for the House and Senate. In *Marsh* v. *Chambers,* 463 U. S. 783 (1983), we noted that 17 Members of that First Congress had been Delegates to the Constitutional Convention where freedom of speech, press, and religion and antagonism toward an established church were subjects of frequent discussion. We saw no conflict with the Establishment Clause when Nebraska employed members of the clergy as official legislative Chaplains to give opening prayers at sessions of the state legislature. *Id.,* at 791.

The interpretation of the Establishment Clause by Congress in 1789 takes on special significance in light of the Court's emphasis that the First Congress

> "was a Congress whose constitutional decisions have always been regarded, as they should be regarded, as of the greatest weight in the interpretation of that fundamental instument," *Myers* v. *United States,* 272 U. S. 52, 174–175 (1926).

It is clear that neither the 17 draftsmen of the Constitution who were Members of the First Congress, nor the Congress of 1789, saw any establishment problem in the employment of congressional Chaplains to offer daily prayers in the Congress, a practice that has continued for nearly two centuries. It would be difficult to identify a more striking example of the accommodation of religious belief intended by the Framers.

## C

There is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789. Seldom in our opinions was this more affirmatively expressed than in Justice Douglas' opinion for the Court validating a program allowing release of

public school students from classes to attend off-campus religious exercises. Rejecting a claim that the program violated the Establishment Clause, the Court asserted pointedly:

> "We are a religious people whose institutions presuppose a Supreme Being." *Zorach* v. *Clauson, supra*, at 313.

See also *Abington School District* v. *Schempp*, 374 U. S. 203, 213 (1963).

Our history is replete with official references to the value and invocation of Divine guidance in deliberations and pronouncements of the Founding Fathers and contemporary leaders. Beginning in the early colonial period long before Independence, a day of Thanksgiving was celebrated as a religious holiday to give thanks for the bounties of Nature as gifts from God. President Washington and his successors proclaimed Thanksgiving, with all its religious overtones, a day of national celebration[2] and Congress made it a National Holiday more than a century ago. Ch. 167, 16 Stat. 168. That holiday has not lost its theme of expressing thanks for Divine aid[3] any more than has Christmas lost its religious significance.

---

[2] The day after the First Amendment was proposed, Congress urged President Washington to proclaim "a day of public thanksgiving and prayer, to be observed by acknowledging with grateful hearts the many and signal favours of Almighty God." See A. Stokes & L. Pfeffer, Church and State in the United States 87 (rev. 1st ed. 1964). President Washington proclaimed November 26, 1789, a day of thanksgiving to "offe[r] our prayers and supplications to the Great Lord and Ruler of Nations, and beseech Him to pardon our national and other transgressions . . . ." 1 J. Richardson, A Compilation of the Messages and Papers of the Presidents 1789–1897, p. 64 (1899).

Presidents Adams and Madison also issued Thanksgiving Proclamations, as have almost all our Presidents, see 3 A. Stokes, Church and State in the United States 180–193 (1950), through the incumbent, see Presidential Proclamation No. 4883, 3 CFR 68 (1982).

[3] An example is found in President Roosevelt's 1944 Proclamation of Thanksgiving:

"[I]t is fitting that we give thanks with special fervor to our Heavenly Father for the mercies we have received individually and as a nation and

Executive Orders and other official announcements of Presidents and of the Congress have proclaimed both Christmas and Thanksgiving National Holidays in religious terms. And, by Acts of Congress, it has long been the practice that federal employees are released from duties on these National Holidays, while being paid from the same public revenues that provide the compensation of the Chaplains of the Senate and the House and the military services. See J. Res. 5, 23 Stat. 516. Thus, it is clear that Government has long recognized—indeed it has subsidized—holidays with religious significance.

Other examples of reference to our religious heritage are found in the statutorily prescribed national motto "In God We Trust," 36 U. S. C. § 186, which Congress and the President mandated for our currency, see 31 U. S. C. § 5112(d)(1) (1982 ed.), and in the language "One nation under God," as part of the Pledge of Allegiance to the American flag. That pledge is recited by many thousands of public school children—and adults—every year.

Art galleries supported by public revenues display religious paintings of the 15th and 16th centuries, predominantly inspired by one religious faith. The National Gallery in

---

for the blessings He has restored, through the victories of our arms and those of our Allies, to His children in other lands.

. . . . .

"To the end that we may bear more earnest witness to our gratitude to Almighty God, I suggest a nationwide reading of the Holy Scriptures during the period from Thanksgiving Day to Christmas." Presidential Proclamation No. 2629, 58 Stat. 1160.

President Reagan and his immediate predecessors have issued similar Proclamations. See, e. g., Presidential Proclamation No. 5098, 3 CFR 94 (1984); Presidential Proclamation No. 4803, 3 CFR 117 (1981); Presidential Proclamation No. 4333, 3 CFR 419 (1971–1975 Comp.); Presidential Proclamation No. 4093, 3 CFR 89 (1971–1975 Comp.); Presidential Proclamation No. 3752, 3 CFR 75 (1966–1970 Comp.); Presidential Proclamation No. 3560, 3 CFR 312 (1959–1963 Comp.).

Washington, maintained with Government support, for example, has long exhibited masterpieces with religious messages, notably the Last Supper, and paintings depicting the Birth of Christ, the Crucifixion, and the Resurrection, among many others with explicit Christian themes and messages.[4] The very chamber in which oral arguments on this case were heard is decorated with a notable and permanent—not seasonal—symbol of religion: Moses with the Ten Commandments. Congress has long provided chapels in the Capitol for religious worship and meditation.

There are countless other illustrations of the Government's acknowledgment of our religious heritage and governmental sponsorship of graphic manifestations of that heritage. Congress has directed the President to proclaim a National Day of Prayer each year "on which [day] the people of the United States may turn to God in prayer and meditation at churches, in groups, and as individuals." 36 U. S. C. § 169h. Our Presidents have repeatedly issued such Proclamations.[5] Presidential Proclamations and messages have also issued to commemorate Jewish Heritage Week, Presidential Proclamation No. 4844, 3 CFR 30 (1982), and the Jewish High Holy Days, 17 Weekly Comp. of Pres. Doc. 1058 (1981). One cannot look at even this brief résumé without finding that our history is pervaded by expressions of religious beliefs such as are found in *Zorach*. Equally pervasive is the evidence of accommodation of all faiths and all forms of religious expression, and hostility toward none. Through this accommoda-

---

[4] The National Gallery regularly exhibits more than 200 similar religious paintings.

[5] See, *e. g.*, Presidential Proclamation No. 5017, 3 CFR 8 (1984); Presidential Proclamation No. 4795, 3 CFR 109 (1981); Presidential Proclamation No. 4379, 3 CFR 486 (1971–1975 Comp.); Presidential Proclamation No. 4087, 3 CFR 81 (1971–1975 Comp.); Presidential Proclamation No. 3812, 3 CFR 155 (1966–1970 Comp.); Presidential Proclamation No. 3501, 3 CFR 228 (1959–1963 Comp.).

tion, as Justice Douglas observed, governmental action has "follow[ed] the best of our traditions" and "respect[ed] the religious nature of our people." 343 U. S., at 314.

## III

This history may help explain why the Court consistently has declined to take a rigid, absolutist view of the Establishment Clause. We have refused "to construe the Religion Clauses with a literalness that would undermine the ultimate constitutional objective *as illuminated by history.*" *Walz* v. *Tax Comm'n,* 397 U. S. 664, 671 (1970) (emphasis added). In our modern, complex society, whose traditions and constitutional underpinnings rest on and encourage diversity and pluralism in all areas, an absolutist approach in applying the Establishment Clause is simplistic and has been uniformly rejected by the Court.

Rather than mechanically invalidating all governmental conduct or statutes that confer benefits or give special recognition to religion in general or to one faith—as an absolutist approach would dictate—the Court has scrutinized challenged legislation or official conduct to determine whether, in reality, it establishes a religion or religious faith, or tends to do so. See *Walz, supra,* at 669. Joseph Story wrote a century and a half ago:

> "The real object of the [First] Amendment was . . . to prevent any national ecclesiastical establishment, which should give to an hierarchy the exclusive patronage of the national government." 3 J. Story, Commentaries on the Constitution of the United States 728 (1833).

In each case, the inquiry calls for line-drawing; no fixed, *per se* rule can be framed. The Establishment Clause like the Due Process Clauses is not a precise, detailed provision in a legal code capable of ready application. The purpose of the Establishment Clause "was to state an objective, not to write a statute." *Walz, supra,* at 668. The line between permissible relationships and those barred by the Clause can no

more be straight and unwavering than due process can be defined in a single stroke or phrase or test. The Clause erects a "blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." *Lemon*, 403 U. S., at 614.

In the line-drawing process we have often found it useful to inquire whether the challenged law or conduct has a secular purpose, whether its principal or primary effect is to advance or inhibit religion, and whether it creates an excessive entanglement of government with religion. *Lemon, supra.* But, we have repeatedly emphasized our unwillingness to be confined to any single test or criterion in this sensitive area. See, *e. g., Tilton* v. *Richardson*, 403 U. S. 672, 677–678 (1971); *Nyquist*, 413 U. S., at 773. In two cases, the Court did not even apply the *Lemon* "test." We did not, for example, consider that analysis relevant in *Marsh* v. *Chambers*, 463 U. S. 783 (1983). Nor did we find *Lemon* useful in *Larson* v. *Valente*, 456 U. S. 228 (1982), where there was substantial evidence of overt discrimination against a particular church.

In this case, the focus of our inquiry must be on the crèche in the context of the Christmas season. See, *e. g., Stone* v. *Graham*, 449 U. S. 39 (1980) *(per curiam); Abington School District* v. *Schempp*, 374 U. S. 203 (1963). In *Stone*, for example, we invalidated a state statute requiring the posting of a copy of the Ten Commandments on public classroom walls. But the Court carefully pointed out that the Commandments were posted purely as a religious admonition, not "integrated into the school curriculum, where the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like." 449 U. S., at 42. Similarly, in *Abington*, although the Court struck down the practices in two States requiring daily Bible readings in public schools, it specifically noted that nothing in the Court's holding was intended to "indicat[e] that such study of the Bible or of religion, when presented objectively as part of a secular program of education, may not be effected consist-

ently with the First Amendment." 374 U. S., at 225. Focus exclusively on the religious component of any activity would inevitably lead to its invalidation under the Establishment Clause.

The Court has invalidated legislation or governmental action on the ground that a secular purpose was lacking, but only when it has concluded there was no question that the statute or activity was motivated wholly by religious considerations. See, *e. g., Stone* v. *Graham, supra,* at 41; *Epperson* v. *Arkansas,* 393 U. S. 97, 107–109 (1968); *Abington School District* v. *Schempp, supra,* at 223–224; *Engel* v. *Vitale,* 370 U. S. 421, 424–425 (1962). Even where the benefits to religion were substantial, as in *Everson* v. *Board of Education,* 330 U. S. 1 (1947); *Board of Education* v. *Allen,* 392 U. S. 236 (1968); *Walz, supra;* and *Tilton, supra,* we saw a secular purpose and no conflict with the Establishment Clause. Cf. *Larkin* v. *Grendel's Den, Inc.,* 459 U. S. 116 (1982).

The District Court inferred from the religious nature of the crèche that the city has no secular purpose for the display. In so doing, it rejected the city's claim that its reasons for including the crèche are essentially the same as its reasons for sponsoring the display as a whole. The District Court plainly erred by focusing almost exclusively on the crèche. When viewed in the proper context of the Christmas Holiday season, it is apparent that, on this record, there is insufficient evidence to establish that the inclusion of the crèche is a purposeful or surreptitious effort to express some kind of subtle governmental advocacy of a particular religious message. In a pluralistic society a variety of motives and purposes are implicated. The city, like the Congresses and Presidents, however, has principally taken note of a significant historical religious event long celebrated in the Western World. The crèche in the display depicts the historical origins of this traditional event long recognized as a National Holiday. See *Allen* v. *Hickel,* 138 U. S. App. D. C. 31, 424 F. 2d 944

(1970); *Citizens Concerned for Separation of Church and State* v. *City and County of Denver*, 526 F. Supp. 1310 (Colo. 1981).

The narrow question is whether there is a secular purpose for Pawtucket's display of the crèche. The display is sponsored by the city to celebrate the Holiday and to depict the origins of that Holiday. These are legitimate secular purposes.[6] The District Court's inference, drawn from the religious nature of the crèche, that the city has no secular purpose was, on this record, clearly erroneous.[7]

The District Court found that the primary effect of including the crèche is to confer a substantial and impermissible benefit on religion in general and on the Christian faith in particular. Comparisons of the relative benefits to religion of different forms of governmental support are elusive and difficult to make. But to conclude that the primary effect of including the crèche is to advance religion in violation of the Establishment Clause would require that we view it as more beneficial to and more an endorsement of religion, for example, than expenditure of large sums of public money for textbooks supplied throughout the country to students attending church-sponsored schools, *Board of Education* v. *Allen, supra;*[8] expenditure of public funds for transportation of

---

[6] The city contends that the purposes of the display are "exclusively secular." We hold only that Pawtucket has a secular purpose for its display, which is all that *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971), requires. Were the test that the government must have "exclusively secular" objectives, much of the conduct and legislation this Court has approved in the past would have been invalidated.

[7] JUSTICE BRENNAN argues that the city's objectives could have been achieved without including the crèche in the display, *post,* at 699. True or not, that is irrelevant. The question is whether the display of the crèche violates the Establishment Clause.

[8] The *Allen* Court noted that "[p]erhaps free books make it more likely that some children choose to attend a sectarian school . . . ." 392 U. S., at 244.

students to church-sponsored schools, *Everson* v. *Board of Education, supra;*[9] federal grants for college buildings of church-sponsored institutions of higher education combining secular and religious education, *Tilton* v. *Richardson,* 403 U. S. 672 (1971);[10] noncategorical grants to church-sponsored colleges and universities, *Roemer* v. *Board of Public Works,* 426 U. S. 736 (1976); and the tax exemptions for church properties sanctioned in *Walz* v. *Tax Comm'n,* 397 U. S. 664 (1970). It would also require that we view it as more of an endorsement of religion than the Sunday Closing Laws upheld in *McGowan* v. *Maryland,* 366 U. S. 420 (1961);[11] the release time program for religious training in *Zorach* v. *Clauson,* 343 U. S. 306 (1952); and the legislative prayers upheld in *Marsh* v. *Chambers,* 463 U. S. 783 (1983).

We are unable to discern a greater aid to religion deriving from inclusion of the crèche than from these benefits and endorsements previously held not violative of the Establishment Clause. What was said about the legislative prayers in *Marsh, supra,* at 792, and implied about the Sunday Closing Laws in *McGowan* is true of the city's inclusion of the crèche: its "reason or effect merely happens to coincide or harmonize with the tenets of some . . . religions." See *McGowan, supra,* at 442.

This case differs significantly from *Larkin* v. *Grendel's Den, Inc., supra,* and *McCollum,* where religion was sub-

---

[9] In *Everson,* the Court acknowledged that "[i]t is undoubtedly true that children are helped to get to church schools," and that "some of the children might not be sent to the church schools if the parents were compelled to pay their children's bus fares out of their own pockets . . . ." 330 U. S., at 17.

[10] We recognized in *Tilton* that the construction grants "surely aid[ed]" the institutions that received them. 403 U. S., at 679.

[11] "In *McGowan* v. *Maryland* . . . Sunday Closing Laws were sustained even though one of their undeniable effects was to render it somewhat more likely that citizens would respect religious institutions and even attend religious services." *Committee for Public Education & Religious Liberty* v. *Nyquist,* 413 U. S. 756, 775–776 (1973).

stantially aided. In *Grendel's Den,* important governmental power—a licensing veto authority—had been vested in churches. In *McCollum,* government had made religious instruction available in public school classrooms; the State had not only used the public school buildings for the teaching of religion, it had "afford[ed] sectarian groups an invaluable aid . . . [by] provid[ing] pupils for their religious classes through use of the State's compulsory public school machinery." 333 U. S., at 212. No comparable benefit to religion is discernible here.

The dissent asserts some observers may perceive that the city has aligned itself with the Christian faith by including a Christian symbol in its display and that this serves to advance religion. We can assume, *arguendo,* that the display advances religion in a sense; but our precedents plainly contemplate that on occasion some advancement of religion will result from governmental action. The Court has made it abundantly clear, however, that "not every law that confers an 'indirect,' 'remote,' or 'incidental' benefit upon [religion] is, for that reason alone, constitutionally invalid." *Nyquist,* 413 U. S., at 771; see also *Widmar* v. *Vincent,* 454 U. S. 263, 273 (1981). Here, whatever benefit there is to one faith or religion or to all religions, is indirect, remote, and incidental; display of the crèche is no more an advancement or endorsement of religion than the Congressional and Executive recognition of the origins of the Holiday itself as "Christ's Mass," or the exhibition of literally hundreds of religious paintings in governmentally supported museums.

The District Court found that there had been no administrative entanglement between religion and state resulting from the city's ownership and use of the crèche. 525 F. Supp., at 1179. But it went on to hold that some political divisiveness was engendered by this litigation. Coupled with its finding of an impermissible sectarian purpose and effect, this persuaded the court that there was "excessive entanglement." The Court of Appeals expressly declined to

accept the District Court's finding that inclusion of the crèche has caused political divisiveness along religious lines, and noted that this Court has never held that political divisiveness alone was sufficient to invalidate government conduct.

Entanglement is a question of kind and degree. In this case, however, there is no reason to disturb the District Court's finding on the absence of administrative entanglement. There is no evidence of contact with church authorities concerning the content or design of the exhibit prior to or since Pawtucket's purchase of the crèche. No expenditures for maintenance of the crèche have been necessary; and since the city owns the crèche, now valued at $200, the tangible material it contributes is *de minimis*. In many respects the display requires far less ongoing, day-to-day interaction between church and state than religious paintings in public galleries. There is nothing here, of course, like the "comprehensive, discriminating, and continuing state surveillance" or the "enduring entanglement" present in *Lemon*, 403 U. S., at 619–622.

The Court of Appeals correctly observed that this Court has not held that political divisiveness alone can serve to invalidate otherwise permissible conduct. And we decline to so hold today. This case does not involve a direct subsidy to church-sponsored schools or colleges, or other religious institutions, and hence no inquiry into potential political divisiveness is even called for, *Mueller* v. *Allen*, 463 U. S. 388, 403–404, n. 11 (1983). In any event, apart from this litigation there is no evidence of political friction or divisiveness over the crèche in the 40-year history of Pawtucket's Christmas celebration. The District Court stated that the inclusion of the crèche for the 40 years has been "marked by no apparent dissension" and that the display has had a "calm history." 525 F. Supp., at 1179. Curiously, it went on to hold that the political divisiveness engendered by this lawsuit was evidence of excessive entanglement. A litigant cannot, by the very act of commencing a lawsuit, however, create the ap-

pearance of divisiveness and then exploit it as evidence of entanglement.

We are satisfied that the city has a secular purpose for including the crèche, that the city has not impermissibly advanced religion, and that including the crèche does not create excessive entanglement between religion and government.

## IV

JUSTICE BRENNAN describes the crèche as a "re-creation of an event that lies at the heart of Christian faith," *post*, at 711. The crèche, like a painting, is passive; admittedly it is a reminder of the origins of Christmas. Even the traditional, purely secular displays extant at Christmas, with or without a crèche, would inevitably recall the religious nature of the Holiday. The display engenders a friendly community spirit of goodwill in keeping with the season. The crèche may well have special meaning to those whose faith includes the celebration of religious Masses, but none who sense the origins of the Christmas celebration would fail to be aware of its religious implications. That the display brings people into the central city, and serves commercial interests and benefits merchants and their employees, does not, as the dissent points out, determine the character of the display. That a prayer invoking Divine guidance in Congress is preceded and followed by debate and partisan conflict over taxes, budgets, national defense, and myriad mundane subjects, for example, has never been thought to demean or taint the sacredness of the invocation.[12]

Of course the crèche is identified with one religious faith but no more so than the examples we have set out from prior cases in which we found no conflict with the Establishment

---

[12] JUSTICE BRENNAN states that "by focusing on the holiday 'context' in which the nativity scene appear[s]," the Court "seeks to explain away the clear religious import of the crèche," *post*, at 705, and that it has equated the crèche with a Santa's house or reindeer, *post*, at 711–712. Of course this is not true.

Clause. See, *e. g.*, *McGowan* v. *Maryland*, 366 U. S. 420 (1961); *Marsh* v. *Chambers*, 463 U. S. 783 (1983). It would be ironic, however, if the inclusion of a single symbol of a particular historic religious event, as part of a celebration acknowledged in the Western World for 20 centuries, and in this country by the people, by the Executive Branch, by the Congress, and the courts for 2 centuries, would so "taint" the city's exhibit as to render it violative of the Establishment Clause. To forbid the use of this one passive symbol—the crèche—at the very time people are taking note of the season with Christmas hymns and carols in public schools and other public places, and while the Congress and legislatures open sessions with prayers by paid chaplains, would be a stilted overreaction contrary to our history and to our holdings. If the presence of the crèche in this display violates the Establishment Clause, a host of other forms of taking official note of Christmas, and of our religious heritage, are equally offensive to the Constitution.

The Court has acknowledged that the "fears and political problems" that gave rise to the Religion Clauses in the 18th century are of far less concern today. *Everson*, 330 U. S., at 8. We are unable to perceive the Archbishop of Canterbury, the Bishop of Rome, or other powerful religious leaders behind every public acknowledgment of the religious heritage long officially recognized by the three constitutional branches of government. Any notion that these symbols pose a real danger of establishment of a state church is farfetched indeed.

## V

That this Court has been alert to the constitutionally expressed opposition to the establishment of religion is shown in numerous holdings striking down statutes or programs as violative of the Establishment Clause. See, *e. g.*, *Illinois ex rel. McCollum* v. *Board of Education*, 333 U. S. 203 (1948); *Epperson* v. *Arkansas*, 393 U. S. 97 (1968); *Lemon* v. *Kurtzman, supra; Levitt* v. *Committee for Public Education & Religious Liberty*, 413 U. S. 472 (1973); *Committee*

*for Public Education & Religious Liberty* v. *Nyquist,* 413 U. S. 756 (1973); *Meek* v. *Pittenger,* 421 U. S. 349 (1975); and *Stone* v. *Graham,* 449 U. S. 39 (1980). The most recent example of this careful scrutiny is found in the case invalidating a municipal ordinance granting to a church a virtual veto power over the licensing of liquor establishments near the church. *Larkin* v. *Grendel's Den, Inc.,* 459 U. S. 116 (1982). Taken together these cases abundantly demonstrate the Court's concern to protect the genuine objectives of the Establishment Clause. It is far too late in the day to impose a crabbed reading of the Clause on the country.

## VI

We hold that, notwithstanding the religious significance of the crèche, the city of Pawtucket has not violated the Establishment Clause of the First Amendment.[18] Accordingly, the judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE O'CONNOR, concurring.

I concur in the opinion of the Court. I write separately to suggest a clarification of our Establishment Clause doctrine. The suggested approach leads to the same result in this case as that taken by the Court, and the Court's opinion, as I read it, is consistent with my analysis.

## I

The Establishment Clause prohibits government from making adherence to a religion relevant in any way to a person's standing in the political community. Government can run afoul of that prohibition in two principal ways. One is ex-

---

[18] The Court of Appeals viewed *Larson* v. *Valente,* 456 U. S. 228 (1982), as commanding a "strict scrutiny" due to the city's ownership of the $200 crèche which it considers as a discrimination between Christian and other religions. It is correct that we require strict scrutiny of a statute or practice patently discriminatory on its face. But we are unable to see this display, or any part of it, as explicitly discriminatory in the sense contemplated in *Larson.*

cessive entanglement with religious institutions, which may interfere with the independence of the institutions, give the institutions access to government or governmental powers not fully shared by nonadherents of the religion, and foster the creation of political constituencies defined along religious lines. *E. g., Larkin* v. *Grendel's Den, Inc.,* 459 U. S. 116 (1982). The second and more direct infringement is government endorsement or disapproval of religion. Endorsement sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community. Disapproval sends the opposite message. See generally *Abington School District* v. *Schempp,* 374 U. S. 203 (1963).

Our prior cases have used the three-part test articulated in *Lemon* v. *Kurtzman,* 403 U. S. 602, 612–613 (1971), as a guide to detecting these two forms of unconstitutional government action.* It has never been entirely clear, however,

---

*The Court wrote in *Lemon* v. *Kurtzman* that a statute must pass three tests to withstand Establishment Clause challenge.

"First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster 'an excessive government entanglement with religion.'" 403 U. S., at 612–613 (citations omitted).

Though phrased as a uniformly applicable test for constitutionality, this three-part test "provides 'no more than [a] helpful signpos[t]' in dealing with Establishment Clause challenges." *Mueller* v. *Allen,* 463 U. S. 388, 394 (1983) (quoting *Hunt* v. *McNair,* 413 U. S. 734, 741 (1973)).

Moreover, the Court has held that a statute or practice that plainly embodies an intentional discrimination among religions must be closely fitted to a compelling state purpose in order to survive constitutional challenge. See *Larson* v. *Valente,* 456 U. S. 228 (1982). As the Court's opinion observes, *ante,* at 687, n. 13, this case does not involve such discrimination. The *Larson* standard, I believe, may be assimilated to the *Lemon* test in the clarified version I propose. Plain intentional discrimination should give rise to a presumption, which may be overcome by a showing of compelling purpose and close fit, that the challenged government conduct constitutes an endorsement of the favored religion or a disapproval of the disfavored.

how the three parts of the test relate to the principles enshrined in the Establishment Clause. Focusing on institutional entanglement and on endorsement or disapproval of religion clarifies the *Lemon* test as an analytical device.

## II

In this case, as even the District Court found, there is no institutional entanglement. Nevertheless, the respondents contend that the political divisiveness caused by Pawtucket's display of its crèche violates the excessive-entanglement prong of the *Lemon* test. The Court's opinion follows the suggestion in *Mueller* v. *Allen*, 463 U. S. 388, 403–404, n. 11 (1983), and concludes that "no inquiry into potential political divisiveness is even called for" in this case. *Ante*, at 684. In my view, political divisiveness along religious lines should not be an independent test of constitutionality.

Although several of our cases have discussed political divisiveness under the entanglement prong of *Lemon*, see, *e. g.*, *Committee for Public Education & Religious Liberty* v. *Nyquist*, 413 U. S. 756, 796 (1973); *Lemon* v. *Kurtzman*, *supra*, at 623, we have never relied on divisiveness as an independent ground for holding a government practice unconstitutional. Guessing the potential for political divisiveness inherent in a government practice is simply too speculative an enterprise, in part because the existence of the litigation, as this case illustrates, itself may affect the political response to the government practice. Political divisiveness is admittedly an evil addressed by the Establishment Clause. Its existence may be evidence that institutional entanglement is excessive or that a government practice is perceived as an endorsement of religion. But the constitutional inquiry should focus ultimately on the character of the government activity that might cause such divisiveness, not on the divisiveness itself. The entanglement prong of the *Lemon* test is properly limited to institutional entanglement.

## III

The central issue in this case is whether Pawtucket has endorsed Christianity by its display of the crèche. To answer that question, we must examine both what Pawtucket intended to communicate in displaying the crèche and what message the city's display actually conveyed. The purpose and effect prongs of the *Lemon* test represent these two aspects of the meaning of the city's action.

The meaning of a statement to its audience depends both on the intention of the speaker and on the "objective" meaning of the statement in the community. Some listeners need not rely solely on the words themselves in discerning the speaker's intent: they can judge the intent by, for example, examining the context of the statement or asking questions of the speaker. Other listeners do not have or will not seek access to such evidence of intent. They will rely instead on the words themselves; for them the message actually conveyed may be something not actually intended. If the audience is large, as it always is when government "speaks" by word or deed, some portion of the audience will inevitably receive a message determined by the "objective" content of the statement, and some portion will inevitably receive the intended message. Examination of both the subjective and the objective components of the message communicated by a government action is therefore necessary to determine whether the action carries a forbidden meaning.

The purpose prong of the *Lemon* test asks whether government's actual purpose is to endorse or disapprove of religion. The effect prong asks whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval. An affirmative answer to either question should render the challenged practice invalid.

## A

The purpose prong of the *Lemon* test requires that a government activity have a secular purpose. That requirement

is not satisfied, however, by the mere existence of some secular purpose, however dominated by religious purposes. In *Stone* v. *Graham*, 449 U. S. 39 (1980), for example, the Court held that posting copies of the Ten Commandments in schools violated the purpose prong of the *Lemon* test, yet the State plainly had some secular objectives, such as instilling most of the values of the Ten Commandments and illustrating their connection to our legal system, but see 449 U. S., at 41. See also *Abington School District* v. *Schempp*, 374 U. S., at 223–224. The proper inquiry under the purpose prong of *Lemon*, I submit, is whether the government intends to convey a message of endorsement or disapproval of religion.

Applying that formulation to this case, I would find that Pawtucket did not intend to convey any message of endorsement of Christianity or disapproval of non-Christian religions. The evident purpose of including the crèche in the larger display was not promotion of the religious content of the crèche but celebration of the public holiday through its traditional symbols. Celebration of public holidays, which have cultural significance even if they also have religious aspects, is a legitimate secular purpose.

The District Court's finding that the display of the crèche had no secular purpose was based on erroneous reasoning. The District Court believed that it should ascertain the city's purpose in displaying the crèche separate and apart from the general purpose in setting up the display. It also found that, because the tradition-celebrating purpose was suspect in the court's eyes, the city's use of an unarguably religious symbol "raises an inference" of intent to endorse. When viewed in light of correct legal principles, the District Court's finding of unlawful purpose was clearly erroneous.

B

Focusing on the evil of government endorsement or disapproval of religion makes clear that the effect prong of the *Lemon* test is properly interpreted not to require invalidation of a government practice merely because it in fact causes,

even as a primary effect, advancement or inhibition of religion. The laws upheld in *Walz* v. *Tax Comm'n,* 397 U. S. 664 (1970) (tax exemption for religious, educational, and charitable organizations), in *McGowan* v. *Maryland,* 366 U. S. 420 (1961) (mandatory Sunday closing law), and in *Zorach* v. *Clauson,* 343 U. S. 306 (1952) (released time from school for off-campus religious instruction), had such effects, but they did not violate the Establishment Clause. What is crucial is that a government practice not have the effect of communicating a message of government endorsement or disapproval of religion. It is only practices having that effect, whether intentionally or unintentionally, that make religion relevant, in reality or public perception, to status in the political community.

Pawtucket's display of its crèche, I believe, does not communicate a message that the government intends to endorse the Christian beliefs represented by the crèche. Although the religious and indeed sectarian significance of the crèche, as the District Court found, is not neutralized by the setting, the overall holiday setting changes what viewers may fairly understand to be the purpose of the display—as a typical museum setting, though not neutralizing the religious content of a religious painting, negates any message of endorsement of that content. The display celebrates a public holiday, and no one contends that declaration of that holiday is understood to be an endorsement of religion. The holiday itself has very strong secular components and traditions. Government celebration of the holiday, which is extremely common, generally is not understood to endorse the religious content of the holiday, just as government celebration of Thanksgiving is not so understood. The crèche is a traditional symbol of the holiday that is very commonly displayed along with purely secular symbols, as it was in Pawtucket.

These features combine to make the government's display of the crèche in this particular physical setting no more an endorsement of religion than such governmental "acknowl-

edgments" of religion as legislative prayers of the type approved in *Marsh* v. *Chambers*, 463 U. S. 783 (1983), government declaration of Thanksgiving as a public holiday, printing of "In God We Trust" on coins, and opening court sessions with "God save the United States and this honorable court." Those government acknowledgments of religion serve, in the only ways reasonably possible in our culture, the legitimate secular purposes of solemnizing public occasions, expressing confidence in the future, and encouraging the recognition of what is worthy of appreciation in society. For that reason, and because of their history and ubiquity, those practices are not understood as conveying government approval of particular religious beliefs. The display of the crèche likewise serves a secular purpose—celebration of a public holiday with traditional symbols. It cannot fairly be understood to convey a message of government endorsement of religion. It is significant in this regard that the crèche display apparently caused no political divisiveness prior to the filing of this lawsuit, although Pawtucket had incorporated the crèche in its annual Christmas display for some years. For these reasons, I conclude that Pawtucket's display of the crèche does not have the effect of communicating endorsement of Christianity.

The District Court's subsidiary findings on the effect test are consistent with this conclusion. The court found as facts that the crèche has a religious content, that it would not be seen as an insignificant part of the display, that its religious content is not neutralized by the setting, that the display is celebratory and not instructional, and that the city did not seek to counteract any possible religious message. These findings do not imply that the crèche communicates government approval of Christianity. The District Court also found, however, that the government was understood to place its imprimatur on the religious content of the crèche. But whether a government activity communicates endorsement of religion is not a question of simple historical fact.

Although evidentiary submissions may help answer it, the question is, like the question whether racial or sex-based classifications communicate an invidious message, in large part a legal question to be answered on the basis of judicial interpretation of social facts. The District Court's conclusion concerning the effect of Pawtucket's display of its crèche was in error as a matter of law.

## IV

Every government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion. In making that determination, courts must keep in mind both the fundamental place held by the Establishment Clause in our constitutional scheme and the myriad, subtle ways in which Establishment Clause values can be eroded. Government practices that purport to celebrate or acknowledge events with religious significance must be subjected to careful judicial scrutiny.

The city of Pawtucket is alleged to have violated the Establishment Clause by endorsing the Christian beliefs represented by the crèche included in its Christmas display. Giving the challenged practice the careful scrutiny it deserves, I cannot say that the particular crèche display at issue in this case was intended to endorse or had the effect of endorsing Christianity. I agree with the Court that the judgment below must be reversed.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS join, dissenting.

The principles announced in the compact phrases of the Religion Clauses have, as the Court today reminds us, *ante,* at 678–679, proved difficult to apply. Faced with that uncertainty, the Court properly looks for guidance to the settled test announced in *Lemon* v. *Kurtzman,* 403 U. S. 602 (1971), for assessing whether a challenged governmental practice involves an impermissible step toward the establishment of religion. *Ante,* at 679. Applying that test to this case, the

Court reaches an essentially narrow result which turns largely upon the particular holiday context in which the city of Pawtucket's nativity scene appeared. The Court's decision implicitly leaves open questions concerning the constitutionality of the public display on public property of a crèche standing alone, or the public display of other distinctively religious symbols such as a cross.[1] Despite the narrow contours of the Court's opinion, our precedents in my view compel the holding that Pawtucket's inclusion of a life-sized display depicting the biblical description of the birth of Christ as part of its annual Christmas celebration is unconstitutional. Nothing in the history of such practices or the setting in which the city's crèche is presented obscures or diminishes the plain fact that Pawtucket's action amounts to an impermissible governmental endorsement of a particular faith.

## I

Last Term, I expressed the hope that the Court's decision in *Marsh* v. *Chambers*, 463 U. S. 783 (1983), would prove to be only a single, aberrant departure from our settled method

---

[1] For instance, nothing in the Court's opinion suggests that the Court of Appeals for the Third Circuit erred when it found that a city-financed platform and cross used by Pope John Paul II to celebrate Mass and deliver a sermon during his 1979 visit to Philadelphia was an unconstitutional expenditure of city funds. *Gilfillan* v. *City of Philadelphia*, 637 F. 2d 924 (1980). Nor does the Court provide any basis for disputing the holding of the Court of Appeals for the Eleventh Circuit that the erection and maintenance of an illuminated Latin cross on state park property violates the Establishment Clause. *American Civil Liberties Union of Georgia* v. *Rabun County Chamber of Commerce, Inc.*, 698 F. 2d 1098 (1983). See also *Fox* v. *City of Los Angeles*, 22 Cal. 3d 792, 587 P. 2d 663 (1978); *Lowe* v. *City of Eugene*, 254 Ore. 539, 463 P. 2d 360 (1969). And given the Court's focus upon the otherwise secular setting of the Pawtucket crèche, it remains uncertain whether absent such secular symbols as Santa Claus' house, a talking wishing well, and cutout clowns and bears, a similar nativity scene would pass muster under the Court's standard. Cf. *McCreary* v. *Stone*, 575 F. Supp. 1112 (SDNY 1983) (holding that village did not violate Establishment Clause by refusing to permit a private group to erect a crèche in a public park).

of analyzing Establishment Clause cases. *Id.*, at 796 (BREN-
NAN, J., dissenting). That the Court today returns to the
settled analysis of our prior cases gratifies that hope. At the
same time, the Court's less-than-vigorous application of the
*Lemon* test suggests that its commitment to those standards
may only be superficial.[2] After reviewing the Court's opin-
ion, I am convinced that this case appears hard not because
the principles of decision are obscure, but because the Christ-
mas holiday seems so familiar and agreeable. Although the

---

[2] Although I agree with the Court that no single formula can ever fully
capture the analysis that may be necessary to resolve difficult Establish-
ment Clause problems, see n. 11, *infra*, I fail to understand the Court's in-
sistence upon referring to the settled test set forth in *Lemon* as simply one
path that may be followed or not at the Court's option. See *ante*, at 679.
The Court's citation of *Tilton* v. *Richardson*, 403 U. S. 672 (1971), and
*Committee for Public Education & Religious Liberty* v. *Nyquist*, 413
U. S. 756 (1973), to support this assertion is meaningless because both
of those decisions applied the three-prong *Lemon* test. Indeed, ever since
its initial formulation, the *Lemon* test has been consistently looked upon as
the fundamental tool of Establishment Clause analysis. In *Nyquist*, the
Court described the test in mandatory terms: "Taken together, [our] deci-
sions dictate that to pass muster under the Establishment Clause the law
in question [must satisfy the three elements of the *Lemon* test]." 413
U. S., at 772–773. And just last Term in *Larkin* v. *Grendel's Den, Inc.*,
459 U. S. 116 (1982), THE CHIEF JUSTICE, speaking for the Court, wrote
that "[t]his Court has consistently held that a statute must satisfy three
criteria [as set forth in *Lemon*] to pass muster under the Establishment
Clause." *Id.*, at 123. See also *Stone* v. *Graham*, 449 U. S. 39, 40–41
(1980) *(per curiam); Wolman* v. *Walter*, 433 U. S. 229, 235–236 (1977). In
addition, the Court's citation of *Larson* v. *Valente*, 456 U. S. 228 (1982),
also fails to support the Court's assertion. In *Larson*, we first reviewed a
state law granting a denominational preference under a "strict scrutiny"
analysis, *id.*, at 246–251, but then concluded by finding the statute un-
constitutional under the *Lemon* analysis as well. *Id.*, at 251–255. Thus,
despite the Court's efforts to evade the point, the fact remains that *Marsh*
v. *Chambers*, 463 U. S. 783 (1983), is the only case in which the Court has
not applied either the *Lemon* or a "strict scrutiny" analysis. I can only
conclude that with today's unsupported assertion, the Court hopes to
provide a belated excuse for the failure in *Marsh* to address the analysis
of the *Lemon* test.

Court's reluctance to disturb a community's chosen method of celebrating such an agreeable holiday is understandable, that cannot justify the Court's departure from controlling precedent. In my view, Pawtucket's maintenance and display at public expense of a symbol as distinctively sectarian as a crèche simply cannot be squared with our prior cases. And it is plainly contrary to the purposes and values of the Establishment Clause to pretend, as the Court does, that the otherwise secular setting of Pawtucket's nativity scene dilutes in some fashion the crèche's singular religiosity, or that the city's annual display reflects nothing more than an "acknowledgment" of our shared national heritage. Neither the character of the Christmas holiday itself, nor our heritage of religious expression supports this result. Indeed, our remarkable and precious religious diversity as a Nation, see *Torcaso* v. *Watkins*, 367 U. S. 488, 495 (1961); *Abington School Dist.* v. *Schempp*, 374 U. S. 203, 240–241 (1963) (BRENNAN, J., concurring), which the Establishment Clause seeks to protect, runs directly counter to today's decision.

## A

As we have sought to meet new problems arising under the Establishment Clause, our decisions, with few exceptions, have demanded that a challenged governmental practice satisfy the following criteria:

> "First, the [practice] must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, [it] must not foster 'an excessive government entanglement with religion.'" *Lemon* v. *Kurtzman*, 403 U. S., at 612–613 (citations omitted).[3]

---

[3] See *Larkin* v. *Grendel's Den, Inc., supra,* at 123; *Widmar* v. *Vincent,* 454 U. S. 263, 271 (1981); *Wolman* v. *Walter,* 433 U. S. 229, 236 (1977); *Walz* v. *Tax Comm'n,* 397 U. S. 664, 674 (1970). As JUSTICE O'CONNOR's concurring opinion rightly observes, this test provides a helpful analytical

This well-defined three-part test expresses the essential concerns animating the Establishment Clause. Thus, the test is designed to ensure that the organs of government remain strictly separate and apart from religious affairs, for "a union of government and religion tends to destroy government and degrade religion." *Engel* v. *Vitale*, 370 U. S. 421, 431 (1962). And it seeks to guarantee that government maintains a position of neutrality with respect to religion and neither advances nor inhibits the promulgation and practice of religious beliefs. *Everson* v. *Board of Education*, 330 U. S. 1, 15 (1947) ("Neither [a State nor the Federal Government] can pass laws which aid one religion, aid all religions, or prefer one religion over another"); *Epperson* v. *Arkansas*, 393 U. S. 97, 103–104 (1968); *Committee for Public Education & Religious Liberty* v. *Nyquist*, 413 U. S. 756, 792–793 (1973). In this regard, we must be alert in our examination of any challenged practice not only for an official establishment of religion, but also for those other evils at which the Clause was aimed—"'sponsorship, financial support, and active involvement of the sovereign in religious activity.'" *Committee for Public Education & Religious Liberty* v. *Nyquist, supra,* at 772 (quoting *Walz* v. *Tax Comm'n,* 397 U. S. 664, 668 (1970)).

Applying the three-part test to Pawtucket's crèche, I am persuaded that the city's inclusion of the crèche in its Christmas display simply does not reflect a "clearly secular . . . purpose." *Nyquist, supra,* at 773. Unlike the typical case in which the record reveals some contemporaneous expression of a clear purpose to advance religion, see, *e. g., Epperson* v. *Arkansas, supra,* at 107–109; *Engel* v. *Vitale, supra,* at 423, or, conversely, a clear secular purpose, see, *e. g., Lemon* v. *Kurtzman, supra,* at 613; *Wolman* v. *Walter,*

tool in considering the central question posed in this case—whether Pawtucket has run afoul of the Establishment Clause by endorsing religion through its display of the crèche. *Ante,* at 690.

433 U. S. 229, 236 (1977), here we have no explicit statement of purpose by Pawtucket's municipal government accompanying its decision to purchase, display, and maintain the crèche. Governmental purpose may nevertheless be inferred. For instance, in *Stone* v. *Graham*, 449 U. S. 39, 41 (1980) *(per curiam)*, this Court found, despite the State's avowed purpose of reminding schoolchildren of the secular application of the commands of the Decalogue, that the "preeminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature." In the present case, the city claims that its purposes were exclusively secular. Pawtucket sought, according to this view, only to participate in the celebration of a national holiday and to attract people to the downtown area in order to promote pre-Christmas retail sales and to help engender the spirit of goodwill and neighborliness commonly associated with the Christmas season. Brief for Petitioners 29.

Despite these assertions, two compelling aspects of this case indicate that our generally prudent "reluctance to attribute unconstitutional motives" to a governmental body, *Mueller* v. *Allen*, 463 U. S. 388, 394 (1983), should be overcome. First, as was true in *Larkin* v. *Grendel's Den, Inc.*, 459 U. S. 116, 123–124 (1982), all of Pawtucket's "valid secular objectives can be readily accomplished by other means."[4] Plainly, the city's interest in celebrating the holiday and in promoting both retail sales and goodwill are fully served by the elaborate display of Santa Claus, reindeer, and wishing wells that are already a part of Pawtucket's annual Christ-

---

[4] I find it puzzling, to say the least, that the Court today should find "irrelevant," *ante*, at 681, n. 7, the fact that the city's secular objectives can be readily and fully accomplished without including the crèche, since only last Term in *Larkin* v. *Grendel's Den, Inc.*, 459 U. S., at 123–124, the Court relied upon precisely the same point in striking down a Massachusetts statute which vested in church governing bodies the power to veto applications for liquor licenses. It seems the Court is willing to alter its analysis from Term to Term in order to suit its preferred results.

mas display.[5] More importantly, the nativity scene, unlike every other element of the Hodgson Park display, reflects a sectarian exclusivity that the avowed purposes of celebrating the holiday season and promoting retail commerce simply do not encompass. To be found constitutional, Pawtucket's seasonal celebration must at least be nondenominational and not serve to promote religion. The inclusion of a distinctively religious element like the crèche, however, demonstrates that a narrower sectarian purpose lay behind the decision to include a nativity scene. That the crèche retained this religious character for the people and municipal government of Pawtucket is suggested by the Mayor's testimony at trial in which he stated that for him, as well as others in the city, the effort to eliminate the nativity scene from Pawtucket's Christmas celebration "is a step towards establishing another religion, non-religion that it may be." App. 100.[6] Plainly, the city and its leaders understood that the inclusion of the crèche in its display would serve the wholly religious purpose

---

[5] Several representatives of Pawtucket's business community testified that although the overall Christmas display played an important role in promoting downtown holiday trade, the display would serve this purpose equally well even if the crèche were removed. App. 133, 135, 139–140. The Mayor also testified that if the nativity scene had to be eliminated, the city would continue to erect the annual display without it. *Id.*, at 115.

[6] The District Court also admitted into evidence, without objection from petitioners, a considerable amount of correspondence received by Mayor Lynch in support of maintaining the crèche in the city's Christmas display. One such letter, which appears to be representative of the views of many, congratulates the Mayor on his efforts "to keep 'Christ' in Christmas . . . ." App. 161. For the District Court's findings concerning the meaning of these letters, see 525 F. Supp. 1150, 1162 (RI 1981) ("Overall the tenor of the correspondence is that the lawsuit represents an attack on the presence of religion as part of the community's life, an attempt to deny the majority the ability to express publically its beliefs in a desired and traditionally accepted way"). Furthermore, as the District Court found, "the City has accepted and implemented the view of its predominantly Christian citizens that it is a 'good thing' to have a creche in a Christmas display, . . . because it is a good thing to 'keep Christ in Christmas.'" *Id.*, at 1173.

of "keep[ing] 'Christ in Christmas.'" 525 F. Supp. 1150, 1173 (RI 1981). From this record, therefore, it is impossible to say with the kind of confidence that was possible in *McGowan* v. *Maryland,* 366 U. S. 420, 445 (1961), that a wholly secular goal predominates.

The "primary effect" of including a nativity scene in the city's display is, as the District Court found, to place the government's imprimatur of approval on the particular religious beliefs exemplified by the crèche. Those who believe in the message of the nativity receive the unique and exclusive benefit of public recognition and approval of their views. For many, the city's decision to include the crèche as part of its extensive and costly efforts to celebrate Christmas can only mean that the prestige of the government has been conferred on the beliefs associated with the crèche, thereby providing "a significant symbolic benefit to religion . . . ." *Larkin* v. *Grendel's Den, Inc., supra,* at 125–126. The effect on minority religious groups, as well as on those who may reject all religion, is to convey the message that their views are not similarly worthy of public recognition nor entitled to public support.[7] It was precisely this sort of religious chauvinism that the Establishment Clause was intended forever to prohibit. In this case, as in *Engel* v. *Vitale,* "[w]hen the power, prestige and financial support of government is placed behind

---

[7] In this regard, the views expressed by the California Supreme Court in considering a similar issue are particularly relevant:

"When a city so openly promotes the religious meaning of one religion's holidays, the benefit reaped by that religion and the disadvantage suffered by other religions is obvious. Those persons who do not share those holidays are relegated to the status of outsiders by their own government; those persons who do observe those holidays can take pleasure in seeing the symbol of their belief given official sanction and special status." *Fox* v. *City of Los Angeles,* 22 Cal. 3d, at 803, 587 P. 2d, at 670 (striking down as unconstitutional the erection of an illuminated cross in front of city hall).

See also *Lowe* v. *City of Eugene,* 254 Ore., at 544–546, 463 P. 2d, at 363.

a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." 370 U. S., at 431. Our decision in *Widmar* v. *Vincent*, 454 U. S. 263 (1981), rests upon the same principle. There the Court noted that a state university policy of "equal access" for both secular and religious groups would "not confer any imprimatur of state approval" on the religious groups permitted to use the facilities because "a broad spectrum of groups" would be served and there was no evidence that religious groups would dominate the forum. *Id.*, at 274. Here, by contrast, Pawtucket itself owns the crèche and instead of extending similar attention to a "broad spectrum" of religious and secular groups, it has singled out Christianity for special treatment.

Finally, it is evident that Pawtucket's inclusion of a crèche as part of its annual Christmas display does pose a significant threat of fostering "excessive entanglement." As the Court notes, *ante*, at 683, the District Court found no administrative entanglement in this case, primarily because the city had been able to administer the annual display without extensive consultation with religious officials. See 525 F. Supp., at 1179. Of course, there is no reason to disturb that finding, but it is worth noting that after today's decision, administrative entanglements may well develop. Jews and other non-Christian groups, prompted perhaps by the Mayor's remark that he will include a Menorah in future displays,[8] can be expected to press government for inclusion of their symbols, and faced with such requests, government will have to become involved in accommodating the various demands. Cf. *Committee for Public Education & Religious Liberty* v. *Nyquist*, 413 U. S., at 796 ("competing efforts [by religious groups] to gain or maintain the support of government" may "occasio[n] considerable civil strife"). More importantly, although no political divisiveness was apparent in Pawtucket

---

[8] See App. 104.

prior to the filing of respondents' lawsuit, that act, as the District Court found, unleashed powerful emotional reactions which divided the city along religious lines. 525 F. Supp., at 1180. The fact that calm had prevailed prior to this suit does not immediately suggest the absence of any division on the point for, as the District Court observed, the quiescence of those opposed to the crèche may have reflected nothing more than their sense of futility in opposing the majority. *Id.*, at 1179. Of course, the Court is correct to note that we have never held that the potential for divisiveness alone is sufficient to invalidate a challenged governmental practice; we have, nevertheless, repeatedly emphasized that "too close a proximity" between religious and civil authorities, *Schempp*, 374 U. S., at 259 (BRENNAN, J., concurring), may represent a "warning signal" that the values embodied in the Establishment Clause are at risk. *Committee for Public Education & Religious Liberty* v. *Nyquist, supra*, at 798.[9] Furthermore, the Court should not blind itself to the fact that because com-

---

[9]The suggestion in *Mueller* v. *Allen*, 463 U. S. 388, 403–404, n. 11 (1983), relied upon by the Court today, see *ante*, at 684; *ante*, at 689 (O'CONNOR, J., concurring), that inquiry into potential political divisiveness is unnecessary absent direct subsidies to church-sponsored schools or colleges, derives from a distorted reading of our prior cases. Simply because the Court in *Lemon*—a case involving such subsidies— inquired into potential divisiveness while distinguishing *Everson* and *Allen*—cases not involving such subsidies—does not provide any authority for the proposition that the Court in *Lemon* meant to confine the divisiveness inquiry only to cases factually identical to *Lemon* itself. Indeed, in *Walz*, the Court considered the question of divisiveness in the context of state tax exemptions to all religious institutions. I agree, however, with JUSTICE O'CONNOR's helpful suggestion that while political divisiveness is "an evil addressed by the Establishment Clause," the ultimate inquiry must always focus on "the character of the government activity that might cause such divisiveness." *Ante*, at 689. Having said that, I should also emphasize that I disagree fundamentally with JUSTICE O'CONNOR's apparent conclusion that Pawtucket's inclusion of the crèche is not the kind of governmental act that may engender sharp division along religious lines. The contrary is demonstrated by the history of this case.

munities differ in religious composition, the controversy over whether local governments may adopt religious symbols will continue to fester. In many communities, non-Christian groups can be expected to combat practices similar to Pawtucket's; this will be so especially in areas where there are substantial non-Christian minorities.[10]

In sum, considering the District Court's careful findings of fact under the three-part analysis called for by our prior cases, I have no difficulty concluding that Pawtucket's display of the crèche is unconstitutional.[11]

---

[10] This and similar issues relating to governmental endorsement of religious symbols has engendered continuing controversy which has reached the courts on many occasions. See, e. g., *American Civil Liberties Union of Georgia* v. *Rabun County Chamber of Commerce, Inc.*, 698 F. 2d 1098 (CA11 1983); *Florey* v. *Sioux Falls School Dist.*, 619 F. 2d 1311 (CA8 1980); *Allen* v. *Morton*, 161 U. S. App. D. C. 239, 495 F. 2d 65 (1973); *Allen* v. *Hickel*, 138 U. S. App. D. C. 31, 424 F. 2d 944 (1970); *McCreary* v. *Stone*, 575 F. Supp. 1112 (SDNY 1983); *Citizens Concerned for Separation of Church and State* v. *Denver*, 508 F. Supp. 823 (Colo. 1981); *Russell* v. *Mamaroneck*, 440 F. Supp. 607 (SDNY 1977); *Lawrence* v. *Buchmueller*, 40 Misc. 2d 300, 243 N. Y. S. 2d 87 (Sup. Ct. 1963). Given the narrowness of the Court's decision today, see *supra*, at 694–695, and n. 1, the potential for controversy is unlikely to abate.

[11] The Court makes only a halfhearted attempt, see *ante*, at 680–681, 682–683, to grapple with the fact that Judge Pettine's detailed findings may not be overturned unless they are shown to be "clearly erroneous." Fed. Rule Civ. Proc. 52(a). See *Pullman-Standard* v. *Swint*, 456 U. S. 273, 285–290 (1982). In my view, petitioners have made no such showing in this case. JUSTICE O'CONNOR's concurring opinion properly accords greater respect to the District Court's findings, but I am at a loss to understand how the court's specific and well-supported finding that the city was understood to have placed its stamp of approval on the sectarian content of the crèche can, in the face of the *Lemon* test, be dismissed as simply an "error as a matter of law." *Ante*, at 694.

Moreover, although the Court brushes the point aside with little explanation, see *ante*, at 687, n. 13, the *Lemon* decision's three-prong analysis is not the only available standard of review. As the Court of Appeals recognized, the "strict scrutiny" analysis adopted in *Larson* v. *Valente*, 456 U. S., at 244–246, addresses situations in which a governmental policy or

## B

The Court advances two principal arguments to support its conclusion that the Pawtucket crèche satisfies the *Lemon* test. Neither is persuasive.

*First.* The Court, by focusing on the holiday "context" in which the nativity scene appeared, seeks to explain away the clear religious import of the crèche and the findings of the District Court that most observers understood the crèche as both a symbol of Christian beliefs and a symbol of the city's support for those beliefs. See *ante*, at 679–684; see also *ante*, at 694 (O'CONNOR, J., concurring). Thus, although the Court concedes that the city's inclusion of the nativity scene plainly serves "to depict the origins" of Christmas as a "significant historical religious event," *ante*, at 681, 680, and that the crèche "is identified with one religious faith," *ante*, at 685, we are nevertheless expected to believe that Pawtucket's use of the crèche does not signal the city's support for the sectarian symbolism that the nativity scene evokes. The effect of the crèche, of course, must be gauged not only by its inherent re-

practice grants official preference to one religious denomination over another. 691 F. 2d 1029, 1034–1035 (CA1 1982). While I am inclined to agree with the Court of Appeals that Pawtucket's practice fails this test, it is not necessary that I address this point in view of my conclusion that the city's inclusion of the crèche violates the standards fixed in *Lemon*.

Furthermore, I continue to believe that the test I set forth in *Schempp* is an appropriate means of determining whether rights guaranteed by the Establishment Clause have been infringed. In my view, "those involvements of religious with secular institutions which (a) serve the essentially religious activities of religious institutions; (b) employ the organs of government for essentially religious purposes; or (c) use essentially religious means to serve governmental ends, where secular means would suffice" must be struck down. 374 U. S., at 294–295. In the present case, I particularly believe the third element of this test is not met, since all of Pawtucket's governmental goals—celebrating the holiday season and promoting commerce—can be fully realized without the use of the crèche by employing such wholly secular means as Santa Claus, reindeer, and cutout figures. See *supra*, at 699–700.

ligious significance but also by the overall setting in which it appears. But it blinks reality to claim, as the Court does, that by including such a distinctively religious object as the crèche in its Christmas display, Pawtucket has done no more than make use of a "traditional" symbol of the holiday, and has thereby purged the crèche of its religious content and conferred only an "incidental and indirect" benefit on religion.

The Court's struggle to ignore the clear religious effect of the crèche seems to me misguided for several reasons. In the first place, the city has positioned the crèche in a central and highly visible location within the Hodgson Park display. The District Court's findings in this regard are unambiguous:

> "[D]espite the small amount of ground covered by the creche, viewers would not regard the creche as an insignificant part of the display. It is an almost life sized tableau marked off by a white picket fence. Furthermore, its location lends the creche significance. The creche faces the Roosevelt Avenue bus stops and access stairs where the bulk of the display is placed. Moreover, the creche is near two of the most enticing parts of the display for children—Santa's house and the talking wishing well. Although the Court recognizes that one cannot see the creche from all possible vantage points, it is clear from the City's own photos that people standing at the two bus shelters and looking down at the display will see the creche centrally and prominently positioned." 525 F. Supp., at 1176–1177 (citations omitted; footnote omitted).

Moreover, the city has done nothing to disclaim government approval of the religious significance of the crèche, to suggest that the crèche represents only one religious symbol among many others that might be included in a seasonal display truly aimed at providing a wide catalog of ethnic and religious celebrations, or to disassociate itself from the religious content of the crèche. In *Abington School Dist.* v. *Schempp*, 374 U. S., at 225, we noted that reading aloud

from the Bible would be a permissible schoolroom exercise only if it was "presented objectively as part of a secular program of education" that would remove any message of governmental endorsement of religion. Similarly, when the Court of Appeals for the District of Columbia Circuit approved the inclusion of a crèche as part of a national "Pageant of Peace" on federal parkland adjacent to the White House, it did so on the express condition that the Government would erect "explanatory plaques" disclaiming any sponsorship of religious beliefs associated with the crèche. *Allen* v. *Morton*, 161 U. S. App. D. C. 239, 241–242, 495 F. 2d 65, 67–68 (1973) *(per curiam)*. In this case, by contrast, Pawtucket has made no effort whatever to provide a similar cautionary message.

Third, we have consistently acknowledged that an otherwise secular setting alone does not suffice to justify a governmental practice that has the effect of aiding religion. In *Hunt* v. *McNair*, 413 U. S. 734, 743 (1973), for instance, we observed that "[a]id normally may be thought to have a primary effect of advancing religion . . . when it [supports] a specifically religious activity in an otherwise substantially secular setting." The demonstrably secular context of public education, therefore, did not save the challenged practice of school prayer in *Engel* or in *Schempp*. Similarly, in *Tilton* v. *Richardson*, 403 U. S. 672, 683 (1971), despite the generally secular thrust of the financing legislation under review, the Court unanimously struck down that aspect of the program which permitted church-related institutions eventually to assume total control over the use of buildings constructed with federal aid.[12]

---

[12] Indeed, in the aid-to-sectarian-schools cases, the state financing schemes under review almost always require us to focus on a specific element that may violate the Establishment Clause, even though it is a part of a complex and otherwise secular statutory framework. See, *e. g.*, *Meek* v. *Pittenger*, 421 U. S. 349 (1975); *Wolman* v. *Walter*, 433 U. S. 229 (1977). See also *Committee for Public Education & Religious Liberty* v. *Regan*, 444 U. S. 646, 662 (1980) (BLACKMUN, J., dissenting).

Finally, and most importantly, even in the context of Paw-tucket's seasonal celebration, the crèche retains a specifically Christian religious meaning. I refuse to accept the notion implicit in today's decision that non-Christians would find that the religious content of the crèche is eliminated by the fact that it appears as part of the city's otherwise secular celebration of the Christmas holiday. The nativity scene is clearly distinct in its purpose and effect from the rest of the Hodgson Park display for the simple reason that it is the only one rooted in a biblical account of Christ's birth. It is the chief symbol of the characteristically Christian belief that a divine Savior was brought into the world and that the purpose of this miraculous birth was to illuminate a path toward salvation and redemption.[13] For Christians, that path is exclusive, precious, and holy. But for those who do not share these beliefs, the symbolic reenactment of the birth of a divine being who has been miraculously incarnated as a man stands as a dramatic reminder of their differences with Christian faith.[14] When government appears to sponsor such reli-

---

[13] See R. Brown, The Birth of the Messiah (1977); W. Auld, Christmas Traditions (1931); A. McArthur, The Evolution of the Christian Year (1953).

[14] For Christians, of course, the essential message of the nativity is that God became incarnate in the person of Christ. But just as fundamental to Jewish thought is the belief in the "non-incarnation of God, . . . [t]he God in whom [Jews] believe, to whom [Jews] are pledged, does not unite with human substance on earth." M. Buber, Israel and the World (1948) (reprinted in F. Talmage, Disputation and Dialogue: Readings in the Jewish-Christian Encounter 281–282 (1975)) (emphasis deleted). This distinction, according to Buber, "constitute[s] the ultimate division between Judaism and Christianity." Id., at 281. See also R. Reuther, Faith and Fratricide 246 (1974).

Similarly, those who follow the tenets of Unitarianism might well find Pawtucket's support for the symbolism of the crèche, which highlights the Trinitarian tradition in Christian faith, to be an affront to their belief in a single divine being. See J. Williams, What Americans Believe and How They Worship 316–317 (3d ed. 1969). See also C. Olmstead, History of Religion in the United States 296–299 (1960).

giously inspired views, we cannot say that the practice is " 'so separate and so indisputably marked off from the religious function,' . . . that [it] may fairly be viewed as reflect[ing] a neutral posture toward religious institutions." *Nyquist*, 413 U. S., at 782 (quoting *Everson*, 330 U. S., at 18). To be so excluded on religious grounds by one's elected government is an insult and an injury that, until today, could not be countenanced by the Establishment Clause.

*Second.* The Court also attempts to justify the crèche by entertaining a beguilingly simple, yet faulty syllogism. The Court begins by noting that government may recognize Christmas Day as a public holiday; the Court then asserts that the crèche is nothing more than a traditional element of Christmas celebrations; and it concludes that the inclusion of a crèche as part of a government's annual Christmas celebration is constitutionally permissible. See *ante*, at 680–683, 685–686; see also *ante*, at 692–694 (O'CONNOR, J., concurring). The Court apparently believes that once it finds that the designation of Christmas as a public holiday is constitutionally acceptable, it is then free to conclude that virtually every form of governmental association with the celebration of the holiday is also constitutional. The vice of this dangerously superficial argument is that it overlooks the fact that the Christmas holiday in our national culture contains both secular and sectarian elements.[15] To say that government may recognize the holiday's traditional, secular elements of

---

[15] Both the District Court and the Court of Appeals recognized that Christmas comprises both secular and sectarian elements and that this distinction is of constitutional importance. See 525 F. Supp., at 1163–1164; 691 F. 2d, at 1032–1033; *id.*, at 1035–1037 (Bownes, J., concurring). In addition, many observers have explained that historically the Christmas celebration derives both from traditional, folk elements such as gift-giving and winter seasonal celebrations, as well as from Christian religious elements. See, *e. g.*, J. Barnett, The American Christmas, A Study in National Culture 9–14 (1954) (hereafter Barnett); R. Meyers, Celebrations: The Complete Book of American Holidays 309–344 (1972); B. Rosenthal & N. Rosenthal, Christmas 14–15 (1980).

gift-giving, public festivities, and community spirit, does not mean that government may indiscriminately embrace the distinctively sectarian aspects of the holiday. Indeed, in its eagerness to approve the crèche, the Court has advanced a rationale so simplistic that it would appear to allow the Mayor of Pawtucket to participate in the celebration of a Christmas Mass, since this would be just another unobjectionable way for the city to "celebrate the holiday." As is demonstrated below, the Court's logic is fundamentally flawed both because it obscures the reason why public designation of Christmas Day as a holiday is constitutionally acceptable, and blurs the distinction between the secular aspects of Christmas and its distinctively religious character, as exemplified by the crèche.

When government decides to recognize Christmas Day as a public holiday, it does no more than accommodate the calendar of public activities to the plain fact that many Americans will expect on that day to spend time visiting with their families, attending religious services, and perhaps enjoying some respite from preholiday activities. The Free Exercise Clause, of course, does not necessarily compel the government to provide this accommodation, but neither is the Establishment Clause offended by such a step. Cf. *Zorach* v. *Clauson*, 343 U. S. 306 (1952). Because it is clear that the celebration of Christmas has both secular and sectarian elements, it may well be that by taking note of the holiday, the government is simply seeking to serve the same kinds of wholly secular goals—for instance, promoting goodwill and a common day of rest—that were found to justify Sunday Closing Laws in *McGowan* v. *Maryland*, 366 U. S. 420 (1961).[16] If public officials go further and participate in the *secular* celebration

---

[16] It is worth noting that Christmas shares the list of federal holidays with such patently secular, patriotic holidays as the Fourth of July, Memorial Day, Washington's Birthday, Labor Day, and Veterans Day. See 5 U. S. C. § 6103(a). We may reasonably infer from the distinctly secular character of the company that Christmas keeps on this list that it too is included for essentially secular reasons.

of Christmas—by, for example, decorating public places with such secular images as wreaths, garlands, or Santa Claus figures—they move closer to the limits of their constitutional power but nevertheless remain within the boundaries set by the Establishment Clause. But when those officials participate in or appear to endorse the distinctively religious elements of this otherwise secular event, they encroach upon First Amendment freedoms. For it is at that point that the government brings to the forefront the theological content of the holiday, and places the prestige, power, and financial support of a civil authority in the service of a particular faith.

The inclusion of a crèche in Pawtucket's otherwise secular celebration of Christmas clearly violates these principles. Unlike such secular figures as Santa Claus, reindeer, and carolers, a nativity scene represents far more than a mere "traditional" symbol of Christmas. The essence of the crèche's symbolic purpose and effect is to prompt the observer to experience a sense of simple awe and wonder appropriate to the contemplation of one of the central elements of Christian dogma—that God sent His Son into the world to be a Messiah.[17] Contrary to the Court's suggestion, the crèche is far from a mere representation of a "particular historic religious event." *Ante*, at 686. It is, instead, best understood as a mystical re-creation of an event that lies at the heart of Christian faith.[18] To suggest, as the Court does,

---

[17] See W. Auld, Christmas Traditions (1931); A. McArthur, The Evolution of the Christian Year (1953).

[18] As one commentator has observed: "Today of course it is admitted even by Catholic exegetes that [the Biblical stories recounting Christ's birth] are a collection of largely uncertain, mutually contradictory, strongly legendary and ultimately theologically motivated narratives, with a character of their own. Unlike the rest of Jesus' life, there are dream happenings here and angels constantly enter on the scene and leave it—as heavenly messengers of God announcing important events." H. Kung, On Being A Christian 451 (E. Quinn trans., 1976) (footnote omitted). See also R. Brown, The Birth of the Messiah 25–41 (1977); Elliott, The Birth and Background of Jesus of Nazareth, 28 History Today 773, 774–780 (1978).

that such a symbol is merely "traditional" and therefore no different from Santa's house or reindeer is not only offensive to those for whom the crèche has profound significance,[19] but insulting to those who insist for religious or personal reasons that the story of Christ is in no sense a part of "history" nor an unavoidable element of our national "heritage."[20]

For these reasons, the crèche in this context simply cannot be viewed as playing the same role that an ordinary museum display does. See *ante*, at 676–677, 683, 685. The Court seems to assume that prohibiting Pawtucket from displaying a crèche would be tantamount to prohibiting a state college from including the Bible or Milton's Paradise Lost in a course on English literature. But in those cases the religiously inspired materials are being considered solely as literature. The purpose is plainly not to single out the particular religious beliefs that may have inspired the authors, but to see in these writings the outlines of a larger imaginative universe shared with other forms of literary expression.[21] The same may be said of a course devoted to the study of art; when the course turns to Gothic architecture, the emphasis is not on the religious beliefs which the cathedrals exalt, but rather upon the "aesthetic consequences of [such religious] thought."[22]

---

[19] Many Christian commentators have voiced strong objections to what they consider to be the debasement and trivialization of Christmas through too close a connection with commercial and public celebrations. See, *e. g.*, Kelley, Beyond Separation of Church and State, 5 J. Church & State 181 (1963). See generally Barnett 55–57.

[20] See A. Stokes & L. Pfeffer, Church and State in the United States 383 (rev. ed. 1964); R. Morgan, The Supreme Court and Religion 126 (1972); Barnett 68 (discussing opposition by Jews and other non-Christian religious groups to public celebrations of Christmas). See also Talmage, *supra* n. 14.

[21] See N. Frye, The Secular Scripture 14–15 (1976).

[22] O. von Simson, The Gothic Cathedral 27 (1956). See also E. Panofsky, Meaning in the Visual Arts (1974). Compare Justice Jackson's explanation of his view that the study of religiously inspired material can, in the correct

In this case, by contrast, the crèche plays no comparable secular role. Unlike the poetry of Paradise Lost which students in a literature course will seek to appreciate primarily for esthetic or historical reasons, the angels, shepherds, Magi, and infant of Pawtucket's nativity scene can only be viewed as symbols of a particular set of religious beliefs. It would be another matter if the crèche were displayed in a museum setting, in the company of other religiously inspired artifacts, as an example, among many, of the symbolic representation of religious myths. In that setting, we would have objective guarantees that the crèche could not suggest that a particular faith had been singled out for public favor and recognition. The effect of Pawtucket's crèche, however, is not confined by any of these limiting attributes. In the absence of any other religious symbols or of any neutral disclaimer, the inescapable effect of the crèche will be to remind the average observer of the religious roots of the celebration he is witnessing and to call to mind the scriptural message that the nativity symbolizes. The fact that Pawtucket has gone to the trouble of making such an elaborate public celebration and of including a crèche in that otherwise secular setting inevitably serves to reinforce the sense that the city means to express solidarity with the Christian message of the crèche and to dismiss other faiths as unworthy of similar attention and support.

## II

Although the Court's relaxed application of the *Lemon* test to Pawtucket's crèche is regrettable, it is at least understandable and properly limited to the particular facts of this case. The Court's opinion, however, also sounds a broader

---

setting, be made a part of a secular educational program: "[m]usic without sacred music, architecture minus the cathedral, or painting without the scriptural themes would be eccentric and incomplete, even from a secular point of view." *Illinois ex rel. McCollum* v. *Board of Education,* 333 U. S. 203, 236 (1948) (concurring opinion).

and more troubling theme. Invoking the celebration of Thanksgiving as a public holiday, the legend "In God We Trust" on our coins, and the proclamation "God save the United States and this Honorable Court" at the opening of judicial sessions, the Court asserts, without explanation, that Pawtucket's inclusion of a crèche in its annual Christmas display poses no more of a threat to Establishment Clause values than these other official "acknowledgments" of religion. *Ante*, at 674–678, 685–686; see also *ante*, at 692–693 (O'CONNOR, J., concurring).

Intuition tells us that some official "acknowledgment" is inevitable in a religious society if government is not to adopt a stilted indifference to the religious life of the people. See *Illinois ex rel. McCollum* v. *Board of Education*, 333 U. S. 203, 232 (1948) (Jackson, J., concurring). It is equally true, however, that if government is to remain scrupulously neutral in matters of religious conscience, as our Constitution requires, then it must avoid those overly broad acknowledgments of religious practices that may imply governmental favoritism toward one set of religious beliefs. This does not mean, of course, that public officials may not take account, when necessary, of the separate existence and significance of the religious institutions and practices in the society they govern. Should government choose to incorporate some arguably religious element into its public ceremonies, that acknowledgment must be impartial; it must not tend to promote one faith or handicap another; and it should not sponsor religion generally over nonreligion. Thus, in a series of decisions concerned with such acknowledgments, we have repeatedly held that any active form of public acknowledgment of religion indicating sponsorship or endorsement is forbidden. *E. g., Stone* v. *Graham*, 449 U. S. 39 (1980) (posting of Ten Commandments in schoolroom); *Epperson* v. *Arkansas*, 393 U. S. 97 (1968) (prohibition on teaching principles of Darwinian evolution); *Abington School Dist.* v. *Schempp*, 374 U. S. 203 (1963) (mandatory Bible-reading at beginning of

school day); *Engel* v. *Vitale*, 370 U. S. 421 (1962) (mandatory reading of state-composed prayer); *Illinois ex rel. McCollum* v. *Board of Education, supra* (use of public-school facilities for religious instruction).

Despite this body of case law, the Court has never comprehensively addressed the extent to which government may acknowledge religion by, for example, incorporating religious references into public ceremonies and proclamations, and I do not presume to offer a comprehensive approach. Nevertheless, it appears from our prior decisions that at least three principles—tracing the narrow channels which government acknowledgments must follow to satisfy the Establishment Clause—may be identified. First, although the government may not be compelled to do so by the Free Exercise Clause, it may, consistently with the Establishment Clause, act to accommodate to some extent the opportunities of individuals to practice their religion. See *Schempp, supra*, at 296–299 (BRENNAN, J., concurring). That is the essential meaning, I submit, of this Court's decision in *Zorach* v. *Clauson*, 343 U. S. 306 (1952), finding that government does not violate the Establishment Clause when it simply chooses to "close its doors or suspend its operations as to those who want to repair to their religious sanctuary for worship or instruction." *Id.*, at 314. And for me that principle would justify government's decision to declare December 25th a public holiday. See *supra*, at 710.

Second, our cases recognize that while a particular governmental practice may have derived from religious motivations and retain certain religious connotations, it is nonetheless permissible for the government to pursue the practice when it is continued today solely for secular reasons. As this Court noted with reference to Sunday Closing Laws in *McGowan* v. *Maryland*, 366 U. S. 420 (1961), the mere fact that a governmental practice coincides to some extent with certain religious beliefs does not render it unconstitutional. Thanksgiving Day, in my view, fits easily within this princi-

ple, for despite its religious antecedents,[23] the current practice of celebrating Thanksgiving is unquestionably secular and patriotic. We all may gather with our families on that day to give thanks both for personal and national good fortune, but we are free, given the secular character of the holiday, to address that gratitude either to a divine beneficence or to such mundane sources as good luck or the country's abundant natural wealth.

Finally, we have noted that government cannot be completely prohibited from recognizing in its public actions the religious beliefs and practices of the American people as an aspect of our national history and culture. See *Engel* v. *Vitale, supra,* at 435, n. 21; *Schempp, supra,* at 300–304 (BRENNAN, J., concurring). While I remain uncertain about these questions, I would suggest that such practices as the designation of "In God We Trust" as our national motto, or the references to God contained in the Pledge of Allegiance to the flag can best be understood, in Dean Rostow's apt phrase, as a form a "ceremonial deism," [24] protected from Establishment Clause scrutiny chiefly because they have lost through rote repetition any significant religious content. See *Marsh* v. *Chambers,* 463 U. S., at 818 (BRENNAN, J., dissenting).

---

[23] The constitutional problems posed by the religious antecedents of the early Thanksgiving celebrations were well recognized by Thomas Jefferson. Refusing on Establishment Clause grounds to declare national days of thanksgiving or fasting, Jefferson explained:

"I consider the government of the United States as interdicted by the Constitution from intermeddling with religious institutions, their doctrines, disciplines, or exercises. . . . [I]t is only proposed that I should recommend, not prescribe a day of fasting and prayer . . . [But] I do not believe it is for the interest of religion to invite the civil magistrate to direct its exercises, its discipline, or its doctrines . . . . Fasting and prayer are religious exercises; the enjoining them an act of discipline." 11 Jefferson's Writings 428–430 (1904) (emphasis deleted).

See generally L. Pfeffer, Church, State and Freedom 266 (1967).

[24] Sutherland, Book Review, 40 Ind. L. J. 83, 86 (1964) (quoting Dean Rostow's 1962 Meiklejohn Lecture delivered at Brown University).

Moreover, these references are uniquely suited to serve such wholly secular purposes as solemnizing public occasions, or inspiring commitment to meet some national challenge in a manner that simply could not be fully served in our culture if government were limited to purely nonreligious phrases. Cf. *Schempp, supra,* at 265 (BRENNAN, J., concurring). The practices by which the government has long acknowledged religion are therefore probably necessary to serve certain secular functions, and that necessity, coupled with their long history, gives those practices an essentially secular meaning.

The crèche fits none of these categories. Inclusion of the crèche is not necessary to accommodate individual religious expression. This is plainly not a case in which individual residents of Pawtucket have claimed the right to place a crèche as part of a wholly private display on public land. Cf. *Widmar* v. *Vincent,* 454 U. S. 263 (1981); *McCreary* v. *Stone,* 575 F. Supp. 1112 (SDNY 1983). Nor is the inclusion of the crèche necessary to serve wholly secular goals; it is clear that the city's secular purposes of celebrating the Christmas holiday and promoting retail commerce can be fully served without the crèche. Cf. *McGowan* v. *Maryland,* and *supra,* at 699–700. And the crèche, because of its unique association with Christianity, is clearly more sectarian than those references to God that we accept in ceremonial phrases or in other contexts that assure neutrality. The religious works on display at the National Gallery, Presidential references to God during an Inaugural Address, or the national motto present no risk of establishing religion. To be sure, our understanding of these expressions may begin in contemplation of some religious element, but it does not end there. Their message is dominantly secular. In contrast, the message of the crèche begins and ends with reverence for a particular image of the divine.

By insisting that such a distinctively sectarian message is merely an unobjectionable part of our "religious heritage," see *ante,* at 676, 685–686, the Court takes a long step backwards

to the days when Justice Brewer could arrogantly declare for the Court that "this is a Christian nation." *Church of Holy Trinity* v. *United States,* 143 U. S. 457, 471 (1892). Those days, I had thought, were forever put behind us by the Court's decision in *Engel* v. *Vitale,* in which we rejected a similar argument advanced by the State of New York that its Regent's Prayer was simply an acceptable part of our "spiritual heritage." 370 U. S., at 425.

## III

The American historical experience concerning the public celebration of Christmas, if carefully examined, provides no support for the Court's decision. The opening sections of the Court's opinion, while seeking to rely on historical evidence, do no more than recognize the obvious: because of the strong religious currents that run through our history, an inflexible or absolutistic enforcement of the Establishment Clause would be both imprudent and impossible. See *ante,* at 673–678. This observation is at once uncontroversial and unilluminating. Simply enumerating the various ways in which the Federal Government has recognized the vital role religion plays in our society does nothing to help decide the question presented in *this* case.

Indeed, the Court's approach suggests a fundamental misapprehension of the proper uses of history in constitutional interpretation. Certainly, our decisions reflect the fact that an awareness of historical practice often can provide a useful guide in interpreting the abstract language of the Establishment Clause. See, *e. g., Walz* v. *Tax Comm'n,* 397 U. S., at 676–680; *McGowan* v. *Maryland,* 366 U. S., at 431–445; *Engel,* 370 U. S., at 425–429. But historical acceptance of a particular practice alone is never sufficient to justify a challenged governmental action, since, as the Court has rightly observed, "no one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it." *Walz, supra,* at 678. See also *Committee for*

*Public Education & Religious Liberty* v. *Nyquist*, 413 U. S., at 792. Attention to the details of history should not blind us to the cardinal purposes of the Establishment Clause, nor limit our central inquiry in these cases—whether the challenged practices "threaten those consequences which the Framers deeply feared." *Abington School Dist.* v. *Schempp*, 374 U. S., at 236 (BRENNAN, J., concurring). In recognition of this fact, the Court has, until today, consistently limited its historical inquiry to the particular practice under review.

In *McGowan*, for instance, the Court carefully canvassed the entire history of Sunday Closing Laws from the colonial period up to modern times. On the basis of this analysis, we concluded that while such laws were rooted in religious motivations, the current purpose was to serve the wholly secular goal of providing a uniform day of rest for all citizens. 366 U. S., at 445. Our inquiry in *Walz* was similarly confined to the special history of the practice under review. There the Court found a pattern of "undeviating acceptance" over the entire course of the Nation's history of according property-tax exemptions to religious organizations, a pattern which supported our finding that the practice did not violate the Religion Clauses. Finally, where direct inquiry into the Framers' intent reveals that the First Amendment was not understood to prohibit a particular practice, we have found such an understanding compelling. Thus, in *Marsh* v. *Chambers*, after marshaling the historical evidence which indicated that the First Congress had authorized the appointment of paid chaplains for its own proceedings only three days before it reached agreement on the final wording of the Bill of Rights, the Court concluded on the basis of this "unique history" that the modern-day practice of opening legislative sessions with prayer was constitutional. 463 U. S., at 787–791.

Although invoking these decisions in support of its result, the Court wholly fails to discuss the history of the public celebration of Christmas or the use of publicly displayed nativity scenes. The Court, instead, simply asserts, without any historical analysis or support whatsoever, that the now familiar

celebration of Christmas springs from an unbroken history of acknowledgment "by the people, by the Executive Branch, by the Congress, and the courts for 2 centuries . . . ." *Ante*, at 686. The Court's complete failure to offer any explanation of its assertion is perhaps understandable, however, because the historical record points in precisely the opposite direction. Two features of this history are worth noting. First, at the time of the adoption of the Constitution and the Bill of Rights, there was no settled pattern of celebrating Christmas, either as a purely religious holiday or as a public event. Second, the historical evidence, such as it is, offers no uniform pattern of widespread acceptance of the holiday and indeed suggests that the development of Christmas as a public holiday is a comparatively recent phenomenon.[25]

The intent of the Framers with respect to the public display of nativity scenes is virtually impossible to discern primarily because the widespread celebration of Christmas did not emerge in its present form until well into the 19th century. Carrying a well-defined Puritan hostility to the celebration of Christ's birth with them to the New World, the founders of the Massachusetts Bay Colony pursued a vigilant policy of opposition to any public celebration of the holiday.

---

[25] The Court's insistence upon pursuing this vague historical analysis is especially baffling since even the petitioners and their supporting *amici* concede that no historical evidence equivalent to that relied upon in *Marsh*, *McGowan*, or *Walz* supports publicly sponsored Christmas displays. At oral argument, counsel for petitioners was asked whether there is "anything we can refer to to let us know how long it has been the practice in this country for public bodies to have nativity scenes displayed?" Counsel responded: "Specifically, I cannot . . . . The recognition of Christmas [as a public holiday] began in the middle part of the last century . . . but specifically with respect to the use of the nativity scene, we have been unable to locate that data." Tr. of Oral Arg. 8.

In addition, the Solicitor General, appearing as *amicus* in support of petitioners, was asked: "Do we have . . . evidence [of the intent of the Framers] here with respect to the display of a nativity scene?" He responded: "Not with that degree of specificity." *Id.*, at 22–23.

To the Puritans, the celebration of Christmas represented a "Popish" practice lacking any foundation in Scripture. This opposition took legal form in 1659 when the Massachusetts Bay Colony made the observance of Christmas Day, "by abstinence from labor, feasting, or any other way," an offense punishable by fine. Although the Colony eventually repealed this ban in 1681, the Puritan objection remained firm.[26]

During the 18th century, sectarian division over the celebration of the holiday continued. As increasing numbers of members of the Anglican and the Dutch and German Reformed Churches arrived, the practice of celebrating Christmas as a purely religious holiday grew. But denominational differences continued to dictate differences in attitude toward the holiday. American Anglicans, who carried with them the Church of England's acceptance of the holiday, Roman Catholics, and various German groups all made the celebration of Christmas a vital part of their religious life. By contrast, many nonconforming Protestant groups, including the Presbyterians, Congregationalists, Baptists, and Methodists, continued to regard the holiday with suspicion and antagonism well into the 19th century.[27] This pattern of sec-

---

[26] See S. Cobb, The Rise of Religious Liberty in America 209 (rev. ed. 1970). For an example of this notorious Puritan antipathy to the holiday, consider the remarks of Judge Sewell, a Puritan, who in 1685 expressed his concerns about the influence of public celebration of Christmas: "Some, somehow observe the day, but are vexed, I believe, that the Body of the People Profane it; and, blessed be God, no Authority yet to compel them to keep it." Quoted in Barnett 3.

[27] See generally Barnett 4–6, 21–22; Sweet, Christmas in American History, 22 Chi. Theol. Sem. Register 12, 14 (Nov. 1932); R. Meyers, Celebrations: The Complete Book of American Holidays 314–315 (1972). Some indication of this denominational opposition to the religious celebration of Christmas can be gleaned from the following account of Christmas services in the New York Daily Times for December 26, 1855:

"The churches of the Presbyterians, Baptists and Methodists were not open on Dec. 25 except where some Mission Schools had a celebration. They do not accept the day as a Holy One, but the Episcopalian, Catholic

tarian division concerning the holiday suggests that for the Framers of the Establishment Clause, who were acutely sensitive to such sectarian controversies, no single view of how government should approach the celebration of Christmas would be possible.

Many of the same religious sects that were devotedly opposed to the celebration of Christmas on purely religious grounds, were also some of the most vocal and dedicated foes of established religions in the period just prior to the Revolutionary War.[28]  The Puritans, and later the Presbyterians, Baptists, and Methodists, generally associated the celebration of Christmas with the elaborate and, in their view, sacreligious celebration of the holiday by the Church of England, and also with, for them, the more sinister theology of "Popery."[29]  In the eyes of these dissenting religious sects, therefore, the groups most closely associated with estab-

and German Churches were all open.  Inside they were decked with evergreens."  Quoted in Barnett 8.

In addition, consider the account written in 1874 of Henry Ward Beecher, a Congregationalist, describing his New England childhood:

"To me Christmas is a foreign day, and I shall die so.  When I was a boy I wondered what Christmas was.  I knew there was such a time, because we had an Episcopal church in our town and I saw them dressing it with evergreens . . . .  A little later I understood it was a Romish institution, kept up by the Romish Church.  Brought up in the strictest state of New England, brought up in the most literal style of worship . . . I passed all my youth without any knowledge of Christmas, and so I have no associations with the day."  Quoted in Meyers, *supra* n. 15, at 315–316.

[28] The role of these religious groups in the struggle for disestablishment and their place in the history of the Establishment Clause have already been chronicled at some length in our cases, and therefore I will not repeat that history here.  See *Everson* v. *Board of Education*, 330 U. S. 1, 9–15 (1947); *Engel* v. *Vitale*, 370 U. S. 421, 428, and n. 10 (1962); *Committee for Public Education & Religious Liberty* v. *Nyquist*, 413 U. S., at 770, and n. 28.  For more comprehensive discussions of the efforts of these denominations to bring about disestablishment, see S. Cobb, The Rise of Religious Liberty in America (rev. ed. 1970); B. Bailyn, The Ideological Origins of the American Revolution 257–263 (1967); W. McLoughlin, New England Dissent: 1630–1833 (1971); L. Pfeffer, Church, State and Freedom (1967).

[29] See Barnett 2–6.

lished religion—the Churches of England and of Rome—were also most closely linked to the profane practice of publicly celebrating Christmas. For those who authored the Bill of Rights, it seems reasonable to suppose that the public celebration of Christmas would have been regarded as at least a sensitive matter, if not deeply controversial. As we have repeatedly observed, the Religion Clauses were intended to ensure a benign regime of competitive disorder among all denominations, so that each sect was free to vie against the others for the allegiance of its followers without state interference. See *Everson* v. *Board of Education*, 330 U. S. 1 (1947). The historical record, contrary to the Court's uninformed assumption, suggests that at the very least conflicting views toward the celebration of Christmas were an important element of that competition at the time of the adoption of the Constitution.

Furthermore, unlike the religious tax exemptions upheld in *Walz*, the public display of nativity scenes as part of governmental celebrations of Christmas does not come to us supported by an unbroken history of widespread acceptance. It was not until 1836 that a State first granted legal recognition to Christmas as a public holiday. This was followed in the period between 1845 and 1865, by 28 jurisdictions which included Christmas Day as a legal holiday.[30] Congress did not follow the States' lead until 1870 when it established December 25th, along with the Fourth of July, New Year's Day, and Thanksgiving, as a legal holiday in the District of Columbia.[31] This pattern of legal recognition tells us only that

---

[30] For a compilation of these developments, see *id.*, at 19–20.

[31] Ch. 167, 16 Stat. 168. There is no suggestion in the brief congressional discussion concerning the decision to declare Christmas Day a public holiday in the District of Columbia, that Congress meant to do anything more than to put the District on equal footing with the many States that had declared those days public holidays by that time. See Cong. Globe, 41st Cong., 2d Sess., 4805 (1870).

Significantly, it was not until 1885 that Congress provided holiday payment for federal employees on December 25. See J. Res. 5, 23 Stat. 516.

724

public acceptance of the holiday was gradual and that the practice—in stark contrast to the record presented in either *Walz* or *Marsh*—did not take on the character of a widely recognized holiday until the middle of the 19th century.

The historical evidence with respect to public financing and support for governmental displays of nativity scenes is even more difficult to gauge. What is known suggests that German immigrants who settled in Pennsylvania early in the 18th century, presumably drawing upon European traditions, were probably the first to introduce nativity scenes to the American celebration of Christmas.[32] It also appears likely that this practice expanded as more Roman Catholic immigrants settled during the 19th century. From these modest beginnings, the familiar crèche scene developed and gained wider recognition by the late 19th century.[33] It is simply impossible to tell, however, whether the practice ever gained widespread acceptance, much less official endorsement, until the 20th century.

In sum, there is no evidence whatsoever that the Framers would have expressly approved a federal celebration of the Christmas holiday including public displays of a nativity

---

[32] See Barnett 11–12; Meyers, *supra* n. 15. The symbol of the crèche as an artifact of Christmas celebration apparently owes its origins to St. Francis of Assisi who, according to most accounts, first popularized the ritual re-enactment of the birth of Christ by erecting a manger attended by townspeople who played the now-traditional roles of shepherds, Magi, etc., in the village of Greccio, Italy, in 1224. See W. Auld, Christmas Traditions 56 (1931); M. Krythe, All About Christmas 85 (1954).

[33] One commentator has noted that the increasing secularization of the Christmas celebration which occurred during the 19th century led "members of the Puritan and evangelical churches [to be] less inclined to oppose the secular celebration when it no longer symbolized the religious and political dominance of the Church of England. This tolerance increased during the nineteenth century and undoubtedly encouraged [the] popularity [of the celebration of Christmas]." Barnett 6; see also *id.*, at 11–12, 22–23.

scene; accordingly, the Court's repeated invocation of the decision in *Marsh*, see *ante*, at 673–674, 682, 685–686, is not only baffling, it is utterly irrelevant. Nor is there any suggestion that publicly financed and supported displays of Christmas crèches are supported by a record of widespread, undeviating acceptance that extends throughout our history. Therefore, our prior decisions which relied upon concrete, specific historical evidence to support a particular practice simply have no bearing on the question presented in this case. Contrary to today's careless decision, those prior cases have all recognized that the "illumination" provided by history must always be focused on the particular practice at issue in a given case. Without that guiding principle and the intellectual discipline it imposes, the Court is at sea, free to select random elements of America's varied history solely to suit the views of five Members of this Court.

## IV

Under our constitutional scheme, the role of safeguarding our "religious heritage" and of promoting religious beliefs is reserved as the exclusive prerogative of our Nation's churches, religious institutions, and spiritual leaders. Because the Framers of the Establishment Clause understood that "religion is too personal, too sacred, too holy to permit its 'unhallowed perversion' by civil [authorities]," *Engel* v. *Vitale*, 370 U. S., at 432, the Clause demands that government play no role in this effort. The Court today brushes aside these concerns by insisting that Pawtucket has done nothing more than include a "traditional" symbol of Christmas in its celebration of this national holiday, thereby muting the religious content of the crèche. *Ante*, at 685. But the city's action should be recognized for what it is: a coercive, though perhaps small, step toward establishing the sectarian preferences of the majority at the expense of the minority, accomplished by placing public facilities and funds in support of the religious symbolism and theological tidings that the

crèche conveys. As Justice Frankfurter, writing in *Mc-Gowan* v. *Maryland*, observed, the Establishment Clause "withdr[aws] from the sphere of legitimate legislative concern and competence a specific, but comprehensive, area of human conduct: man's belief or disbelief in the verity of some transcendental idea and man's expression in action of that belief or disbelief." 366 U. S., at 465–466 (separate opinion). That the Constitution sets this realm of thought and feeling apart from the pressures and antagonisms of government is one of its supreme achievements. Regrettably, the Court today tarnishes that achievement.

I dissent.


JUSTICE BLACKMUN, with whom JUSTICE STEVENS joins, dissenting.

As JUSTICE BRENNAN points out, the logic of the Court's decision in *Lemon* v. *Kurtzman*, 403 U. S. 602, 612–613 (1971) (which THE CHIEF JUSTICE would say has been applied by this Court "often," *ante*, at 679, but which JUSTICE O'CONNOR acknowledges with the words, "Our prior cases have used the three-part test articulated in *Lemon*," *ante*, at 688), *compels* an affirmance here. If that case and its guidelines mean anything, the presence of Pawtucket's crèche in a municipally sponsored display must be held to be a violation of the First Amendment.

Not only does the Court's resolution of this controversy make light of our precedents, but also, ironically, the majority does an injustice to the crèche and the message it manifests. While certain persons, including the Mayor of Pawtucket, undertook a crusade to "keep 'Christ' in Christmas," App. 161, the Court today has declared that presence virtually irrelevant. The majority urges that the display, "with or without a crèche," "recall[s] the religious nature of the Holiday," and "engenders a friendly community spirit of goodwill in keeping with the season." *Ante*, at 685. Before the District Court, an expert witness for the city made

a similar, though perhaps more candid, point, stating that Pawtucket's display invites people "to participate in the Christmas spirit, brotherhood, peace, and let loose with their money." See 525 F. Supp. 1150, 1161 (RI 1981). The crèche has been relegated to the role of a neutral harbinger of the holiday season, useful for commercial purposes, but devoid of any inherent meaning and incapable of enhancing the religious tenor of a display of which it is an integral part. The city has its victory—but it is a Pyrrhic one indeed.

The import of the Court's decision is to encourage use of the crèche in a municipally sponsored display, a setting where Christians feel constrained in acknowledging its symbolic meaning and non-Christians feel alienated by its presence. Surely, this is a misuse of a sacred symbol. Because I cannot join the Court in denying either the force of our precedents or the sacred message that is at the core of the crèche, I dissent and join JUSTICE BRENNAN's opinion.