James Alexander TANFORD, Kimberly
J. MacDonald, and David Suess,
Plaintiffs,

v.

Dr. Myles BRAND, in his official capacities as President of Indiana University, and Dr. Kenneth R.R. Gros Louis, in his individual and official capacities as Vice President and Chancellor of Indiana University at Bloomington, Defendants.

No. IP 95–492 C B/S.

United States District Court,
S.D. Indiana,
Indianapolis Division.

July 15, 1996.

William Bock III, Kroger Gardis & Regas, Indianapolis, IN, John R. Price, Attorney at Law, Indianapolis, IN, Richard A. Waples, Attorney at Law, Indianapolis, IN, for Plaintiffs.

Robert P. Johnstone, Barnes & Thornburg, Indianapolis, IN, for Defendants.

## ENTRY

BARKER, Chief Judge.

Two graduations ago, plaintiffs filed the instant suit seeking to enjoin Indiana University ("IU") from using an invocation and benediction as part of its official university-wide commencement ceremony. On May 4, 1995, just days before the 1995 ceremony was scheduled to begin, we denied plaintiffs' motion for a preliminary injunction, finding that plaintiffs were unlikely to prevail on the merits of their suit. Today, we reexamine those merits in more detail and, though the record is supplemented and the legal arguments refined, we confirm that earlier finding.

### I. FACTUAL BACKGROUND.

The facts in this case are largely undisputed. Plaintiffs James Alexander Tanford, Kimberly MacDonald and David Suess are, respectively, a tenured law professor and two Indiana University law students.[1] Joseph Urbanski, a recently-added plaintiff, is an undergraduate student who expects to graduate from IU in May of 1999. Defendant Myles Brand is the President of the University and defendant Kenneth R.R. Gros Louis is the Vice President and Chancellor of the University's Bloomington campus. The University is a state institution.

By all accounts, IU's graduation ceremonies are sizeable gatherings. The 1995 ceremony, for example, was held in the football stadium, approximately 5,000 students (out of a graduating class of 7,400) and 150 university officials participated, and between 30,000 to 35,000 people attended. Because of the numbers, students are graduated en masse from their particular schools, and only a few receive individual recognition. The parties agree that between 15% and 55% of graduat-

---

1. Apparently, while this case was pending, MacDonald graduated from the Law School and Suess completed his second year there.

ing law students traditionally participate in this university-wide ceremony.

For over 150 years, the University has invited local clergy to give an invocation and a benediction as part of this ceremony. These prayers are typically recited by ordained ministers of mainstream religious denominations, selected from religious leaders active in the university community. Usually, if not always, the prayers include a reference to a deity.[2] During the ceremony, the cleric is introduced, and the audience is directed to stand during the prayers. The clergyperson, wearing university regalia (cap and gown) also sits on the dais with the University President and other University officials throughout the commencement ceremony.

As part of its graduation-day activities, the School of Law also conducts a second, smaller Recognition Ceremony for its graduates in the IU auditorium. At this ceremony, the University recognizes each of its graduates individually by calling their names and having them walk across the stage to receive their law degrees. Based on past experience, the law school approximates that between 75% to 90% of graduating law students participate, along with family members and friends. Unlike the university-wide ceremony, the law school ceremony does not include an invocation or benediction.

On April 18, 1995, plaintiffs filed the instant suit seeking to permanently enjoin the use of an invocation and benediction as part of the university-wide ceremony. Their one-count complaint alleges that IU's practice of including a prayer violates the Establishment Clause of the First Amendment to the United States Constitution. On February 21, 1996, plaintiffs moved for summary judgment, which under Rule 56(c) of the Federal Rules of Civil Procedure, is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.Proc. 56(c). The burden rests squarely on the party moving for summary judgment to show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). The nonmoving party responding to a properly made and supported summary judgment motion still must set forth facts showing that there is a genuine issue of material fact, that a reasonable jury could return a verdict in its favor and that the movant is not entitled to judgment as a matter of law. *See Wolf v. City of Fitchburg*, 870 F.2d 1327, 1329 (7th Cir.1989).

## II. ANALYSIS.

■ The Establishment Clause of the First Amendment prohibits the establishment of religion in no uncertain terms: "Congress shall make no law respecting an establishment of religion ..." U.S. Const. Amend. I. From this simple beginning, however, much confusion and many lawsuits has ensued. As we emphasized in our entry denying plaintiffs' motion for a preliminary injunction, the purpose of the establishment prohibition is "to prevent, as far as possible, the intrusion of either [the church or the state] into the precincts of the other." *Lemon v. Kurtzman*, 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971). Yet "total separation is not possible in an absolute sense. Some relationship between government and religious organizations is inevitable." *Id.* at 614, 91 S.Ct. at 2112. Indeed, a "relentless and all-pervasive attempt to exclude religion from every aspect of public life could itself become inconsistent with the Constitution." *Lee v. Weisman*, 505 U.S.

---

**2.** The benediction from the May 6, 1995 ceremony reads as follows:

Let us pray. Gracious God we have gathered as dreamers. People who believe deep inside that things can be better. We have been called into being by you to make a difference. We like giving. Be with us as we endeavor to reach out to those who feel distance from the joy and the challenge of truth. We pray that we might touch with our learning those who feel that there is no hope, no reason to believe in life and love, and the possibility itself. Strengthen us for the journeys of mind, of heart, of spirit, of body, so that we might be right in truth for one another, and for our world. We ask this in the name of our common god. Amen.

(Bolyard Supplemental Aff., Ex. A).

577, 597, 112 S.Ct. 2649, 2661, 120 L.Ed.2d 467 (1992).

■ Given the complexity of the task, it is perhaps not surprising that no single criterion adequately defines the fragile line that separates religious indoctrination from a simple accommodation of religion. The test of longest lineage, the so-called *Lemon* test,[3] has fallen into disfavor, yet "however frightening it might be to some, has not been overruled." *Lamb's Chapel v. Center Moriches Union Free School Dist.,* 508 U.S. 384, 394, n. 7, 113 S.Ct. 2141, 2148 n. 7, 124 L.Ed.2d 352 (1993); *see also Fleischfresser v. Directors of School Dist. 200,* 15 F.3d 680, 686 (7th Cir.1994). The Supreme Court case most analogous to the case at bar, *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), adopts a different analysis, though four of the five Justices in the majority either wrote or joined separate concurrences advocating other constitutional standards. Nevertheless, out of this complexity and confusion, two constants appear: (1) "at a minimum, the Constitution guarantees that government may not coerce anyone to support or participate in religion or its exercise," *Lee,* at 586, 112 S.Ct. at 2655, and (2) at most, the Constitution requires that state actions have a secular purpose, that they neither advance nor inhibit religion and that they do not produce excessive government entanglement with religion. *Lemon,* 403 U.S. at 612–13, 91 S.Ct. at 2112. Because plaintiffs have not established as a matter of law that they are entitled to relief under either standard, their motion for summary judgment is denied.

## A. The Coercion Test Employed in *Lee* Poses No Obstacle to IU's Commencement Ceremony.

■ In *Lee v. Weisman,* 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), the Supreme Court held that a prayer delivered by a clergyman at a public middle school graduation ceremony violated the Establishment Clause. In the majority opinion written by Justice Kennedy, the Court emphasized that two factors controlled its decision: (1) "state officials direct[ed] the performance of a formal religious exercise;" and (2) "even for those students who object[ed] to the religious exercise, their attendance and participation in the state-sponsored religious activity [were] in a fair and real sense obligatory...." *Id.,* at 586, at 2655. As a consequence of these two factors—*i.e.,* state involvement coupled with coercion—"the State, in a school setting, in effect required participation in a religious exercise." *Id.* at 594, at 2659.

In this case, *Lee's* state involvement prong is easily satisfied. It is undisputed that University officials pick the date, time and locations for the various graduation ceremonies. They control the content and order of events. They decide whether the ceremony will include an invocation and benediction, and they choose the religious participant.[4] (Shoshana Watkins Dep., at pp. 7–8). University officials even set parameters, albeit general ones, on the prayer's content. (Watkins Dep., at p. 13). Thus, because IU decided to have prayers at graduation, chose the religious participant and influenced the content of the prayer, there appears to be as much state involvement in this case as occurred in *Lee.*

Satisfaction of *Lee's* coercion prong, however, is a closer question. To be sure, *Lee* did not hold that invocations or benedictions always violate the Constitution when offered as part of any public ceremony. Rather, Justice Kennedy conducted a "delicate and fact-sensitive" inquiry that identified four factors contributing to the coercive nature of such prayers in that context. 505 U.S. at 597, 112 S.Ct. at 2661.

First, the Court emphasized that high school students perceive the involvement of their teachers, principals and friends in a religious exercise as inducing a participation they might otherwise reject. Though subtle and indirect, the Court reasoned, this pressure can be as real as overt coercion because

---

**3.** *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).

**4.** "[T]his is a choice attributable to the State, and from a constitutional perspective it is as if a state statute decreed that the prayers must occur." *Lee,* at 586, 112 S.Ct. at 2655.

adolescents are susceptible to pressure from their peers, as well as from their superiors.

Second, the Court held that adolescents are likely to view their acquiescence to the group ritual as an expression of participation. True, "in our culture standing or remaining silent can signify adherence to a view or simple respect for the views of others." *Id.,* at 592, at 2658. Yet, "given our social conventions, a reasonable dissenter in this milieu could believe that the group exercise signified her own participation or approval of it." *Id.,* at 592, at 2658.

Third, because reasonable adolescent dissenters could believe that the act of standing signifies participation, they would be placed "in the dilemma of participating, with all that implies, or protesting." 505 U.S. at 592, 112 S.Ct. at 2658. Given the immaturity of the student participants, however, the Court held that the force of peer pressure made protest unlikely.

Finally, the Court emphasized that high school students could not avoid the dilemma altogether by choosing to bypass the ceremony. Even though not required, attendance was not voluntary "in any real sense ... for absence would require forfeiture of those intangible benefits which have motivated the student through youth and all her high school years." 505 U.S. at 594, 112 S.Ct. at 2659.

Significantly, each of these factors relied at least in part on the "heightened concerns [associated] with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." 505 U.S. at 592, 112 S.Ct. at 2658. To be sure, the majority's conception of what constitutes coercion was broad; coercion does not derive from any formal requirement conditioning the receipt of a diploma on attendance at or participation in the ceremony. Yet, in a practical sense, the coercion was held to be real; the involvement of school authorities, the reality of peer pressure, the importance of a high school graduation and the likelihood that a reasonable dissenter would interpret her silence as participation or approval (rather than as simple respect for the views of others) all combined to cre-

ate the "reasonable perception" to an adolescent dissenter "that she is being forced by the State to pray in a manner her conscience" may not permit. *Id.,* at 592, at 2658.

In this case, the concerns underlying the Court's decision in *Lee* are not present. Plaintiffs—unlike the junior and high school students in *Lee*—are adults. Each has earned or is in the process of earning undergraduate or postgraduate degrees. Three of them—Tanford, Suess and MacDonald—have even been trained as lawyers, a discipline that demands the ability to think independently, to analyze arguments skeptically and to disregard social pressures, peer or otherwise. Indeed, it is difficult to imagine a more rigorous discipline in these respects than that imparted (or attempted to be imparted and implanted) in a legal education.

That plaintiffs have added Joseph Urbanski, an undergraduate, to the case does not change this conclusion. University graduates are purposefully exposed to a wider variety of ideas and beliefs than primary and secondary school students. Of course, many of these competing ideas, beliefs and value systems, "they find distasteful or immoral or absurd or all of these." *Lee,* at 590, 112 S.Ct. at 2657. Yet, in many respects, the very mission of higher education is to challenge basic values instilled during childhood at a time when an individual student has the intellectual maturity to choose between competing beliefs. As the Supreme Court summarized over twenty-five years ago:

> There is substance to the contention that college students are less impressionable and less susceptible to religious indoctrination. Common observation would seem to support that view.... The skepticism of the college student is not an inconsiderable barrier to any attempt or tendency to subvert the ... limitations [prohibiting religious instruction]. Furthermore, by their very nature, college and postgraduate courses tend to limit the opportunities for sectarian influences by virtue of their own internal disciplines.

*Tilton v. Richardson,* 403 U.S. 672, 686, 91

S.Ct. 2091, 2099, 29 L.Ed.2d 790 (1971).[5]

In other words, the special solicitude for younger students traditionally shown by federal courts [6] is not required here. Unlike the adolescent plaintiffs in *Lee,* an adult dissenter who remains quietly seated should not "reasonab[ly] ... believe that the group exercise signifie[s] her own participation or approval" of the prayer or its religious message, but rather her tolerance or respect for the views of others.[7] Nor is peer pressure likely to dissuade a college graduate from choosing to protest. Indeed, Professor Tanford, in the finest tradition of higher education, left the 1987 ceremony before the benediction, in part "hoping that people would ask me later why I had done it and that I then could ... engage them in a dialogue to explain my reasons." (Tanford Dep., pp. 47–48).[8]

In addition to the relative maturity of the participants and the unique role of the University, the coercive nature of IU's commencement is also lessened by the atmosphere of the ceremony itself. In contrast to a high school ceremony, which is highly controlled and "analogous to the classroom setting, where [the Court has] said the risk of compulsion is especially high," *Lee,* 505 U.S. at 595, 112 S.Ct. at 2660, IU's graduation is much less regulated. The 1995 ceremony, for example, encompassed 5,000 graduates and over 30,000 spectators in a football stadium. The ceremony, both by its size and program content, was impersonal; students were graduated en masse from their particular schools and only a few received individual recognition. Thousands of graduates chose not to attend. Undoubtedly, in a large, outdoor stadium, filled with thousands of graduates, a nonadherent could dissent without being noticed and without fear of being identified as a nonconformist. And, because people from all manner of backgrounds, races and religious creeds (including no religious creed) attend, individual acts of standing or remaining silent cannot be interpreted as expressions of a position on the theological merit of certain values, or of religious beliefs in general.

Moreover, because IU's commencement exercises actually involve multiple graduation ceremonies, plaintiffs have meaningful alternatives. Indeed, they can attend the smaller, more intimate law school ceremony, which does not contain an invocation or benediction, but does allow for "individual and personalized recognition" of each students' achievement in earning a degree. (Leonard Fromm Dep., p. 18). Perhaps for this reason, 75% to 90% of law students attend this smaller ceremony, compared to the 15% to 55% who attend the university-wide commencement.

In sum, the "symbolism of a union between church and state is most likely to influence

---

5. Courts and commentators alike have generally described primary and secondary schools as playing a different role from higher education:

   The central fact in the distinction between higher and lower education is the role of value inculcation in the teaching process. The public schools in the United States traditionally have viewed instilling the young with societal values as a significant part of the schools educational mission. Such a mission is directly opposed to the vision of education that underlies the premises of academic freedom in higher education.

   Goldstein, The Asserted Constitutional Right of Public School Teachers to Determine What They Teach, 124 U.Pa.L.R. 1293, 1342–43 (1976).

6. *See Edwards v. Aguillard,* 482 U.S. 578, 583–84, 107 S.Ct. 2573, 2577–78, 96 L.Ed.2d 510 (1987) (noting that because children in public schools are highly impressionable, schools must be careful about sending any religious message); *Grand Rapids School Dist. v. Ball,* 473 U.S. 373, 383, 105 S.Ct. 3216, 3222, 87 L.Ed.2d 267 (1985) ("the government's activities in this area [of religion in public schools] can have a magnified impact on impressionable young minds"); *Widmar v. Vincent,* 454 U.S. 263, 274 n. 14, 102 S.Ct. 269, 276–77 n. 14, 70 L.Ed.2d 440 (1981) (university students are young adults and "are less impressionable than younger students").

7. Professor Tanford essentially admits as much when he states that he does not "believe for a minute that all 7,000 people [who stood for the prayer] believed in the religious message" and that he was "certain there are a lot of people who did not intend by remaining to express agreement with the message." (Tanford Dep., pp. 39, 41).

8. Similarly, MacDonald remained seated and took notes during the invocation and benediction at the 1994 ceremony. (MacDonald Dep., pp. 16–17). Like Tanford, Suess has also absented himself during public prayers in the past. (Suess Dep., pp. 34–35).

children of tender years, whose experience is limited and whose beliefs consequently are the function of environment as much as free and voluntary choice." *Grand Rapids School Dist. v. Ball,* 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985). Since these concerns are not present at a university commencement involving thousands of graduates, multiple ceremonies, advanced degrees and well-defined personal and religious identities, *Lee v. Weisman* does not require that we grant plaintiffs' motion for summary judgment. *Accord Chaudhuri v. State of Tennessee,* 886 F.Supp. 1374, 1386 (M.D.Tenn.1995) (the "Court finds that permitting a prayer to be offered at a public university's graduation ceremony ... presents no real threat of establishing religion").

**B.  *Lemon's* Three–Part Test Does Not Invalidate IU's Use of Prayer.**

While *Lee* establishes the Establishment Clause's minimum protection, the *Lemon* test arguably demarcates the Constitution's outer limits. Under this test, a state action (1) must have a secular purpose, (2) must neither advance nor inhibit religion, and (3) must not produce excessive government entanglement with religion in order to pass constitutional muster. *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971).

**(1).  Secular Purpose**

■ The first *Lemon* factor asks if the challenged action has a secular purpose. Significantly, *Lemon* does not mandate that the government activity have an exclusively secular purpose; only one secular purpose need exist. *Lynch v. Donnelly,* 465 U.S. 668, 681 n. 6, 104 S.Ct. 1355, 1363 n. 6, 79 L.Ed.2d 604 (1984). However, if an obscure secular purpose is wholly dominated by a religious one, then the purpose prong is not satisfied. *Id.* at 690–91, 104 S.Ct. at 1368 (O'Connor, J., concurring).

■ In this case, we cannot say as a matter of law that the preeminent purpose of IU's invocation and benediction is religious. At a minimum, the prayer continues a 155–year–old tradition at the University, solemnizes a public occasion, "express[es] confidence in the future and encourag[es] the recognition of what is worthy of appreciation in society." *Id.* at 693, 104 S.Ct. at 1369 (O'Connor, J., concurring).[9] Moreover, the purpose prong requires that the prayer be examined in the context of the entire ceremony. *Id.* at 679, 104 S.Ct. at 1362. Here, because the invocation and benediction comprise only a few minutes of an otherwise wholly secular ceremony, they simply do not have the same religious force as prayers offered during a worship service, or even at a baccalaureate ceremony. Thus, because a brief invocation/benediction serves the legitimate secular purpose of solemnizing a public ceremony and of continuing a 155–year old university tradition, plaintiffs have not satisfied the first prong of *Lemon* as a matter of law.

**(2).  Primary Effect to Advance Religion**

Under the second prong of *Lemon,* the key inquiry is whether the university's decision to have an invocation and benediction sends primarily a message of endorsement or disapproval of religion. *See Corporation of Presiding Bishop of the Church of Jesus Christ of Latter-day Saints v. Amos,* 483 U.S. 327, 337, 107 S.Ct. 2862, 2869, 97 L.Ed.2d 273 (1987); *County of Allegheny v. ACLU,* 492 U.S. 573, 592–93, 109 S.Ct. 3086, 3100–01, 106 L.Ed.2d 472 (1989); *Wallace v. Jaffree,* 472 U.S. at 75, 105 S.Ct. at 2499. The "test is whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices." *School Dist. of City of Grand Rapids v. Ball,* 473 U.S. 373, 390, 105

---

**9.** *See also Jones v. Clear Creek Indep. School Dist.,* 977 F.2d 963, 967 (5th Cir.1992), *cert. denied,* 508 U.S. 967, 113 S.Ct. 2950, 124 L.Ed.2d 697 (1993) (finding secular purpose in high school graduation prayers); *County of Allegheny v. ACLU,* 492 U.S. 573, 595, n. 46, 109

S.Ct. 3086, 3102, n. 46 106 L.Ed.2d 472 (1989); *but see Harris v. Joint School Dist. No. 241,* 41 F.3d 447, 458 (9th Cir.1994) (finding no secular purpose in high school graduation prayers); *ACLU v. Black Horse Pike Regional Bd. of Educ.,* 84 F.3d 1471, 1484–86 (3d Cir.1996).

S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985); *see generally Lynch,* 465 U.S. at 681–83, 104 S.Ct. at 1363–64 (city's inclusion of a crèche in Christmas display did not have primary effect of endorsing religion).

In this case, given the non-sectarian and brief nature of the prayers, as well as the sophistication of the audience and the university setting, the benefit to one faith over another (or to religion in general) is at most indirect and incidental. Indeed, the very mission of the University is to expose developing young adults to a universe of new ideas and beliefs, most of which the University claims no special allegiance to. Thus, a 30–second prayer delivered as part of larger secular ceremony "would no more commit the University ... to religious goals than it is now committed to the goals of the Students for a Democratic Society [or] the Young Socialist Alliance." *Widmar,* 454 U.S. at 274, 102 S.Ct. at 276 (internal quotation marks omitted). In his deposition, Professor Tanford admits as much when he states that he does not view the non-sectarian prayer as endorsing any particular religion or influencing people's religious beliefs. *See* Tanford Depo. at 42–43. Thus, the court finds as a matter of law that plaintiffs have not satisfied *Lemon's* second prong.

### (3). Excessive Entanglement

*Lemon's* third prong asks whether the challenged action creates an excessive entanglement between church and state. Supreme Court cases relying on the excessive entanglement prong to invalidate state actions have largely involved an enduring association between the government and religious institutions. Often the cases entail state aid to religious or parochial institutions for particular secular purposes. *See, e.g., Lemon,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (state law that paid a portion of private school teachers' salaries for teaching secular subjects was excessive entanglement); *Ball,* 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (sending government teachers to private schools to teach secular classes constituted excessive entanglement). Other cases have involved government delegations of power to religious bodies. *See, e.g., Larkin v. Grendel's Den,* 456 U.S. 913, 102 S.Ct.

1765, 72 L.Ed.2d 171 (1982) (statute giving church-affiliated schools power to veto nearby liquor licenses struck down as excessive entanglement).

In this case, the University's alleged monitoring of the graduation prayers consists of the selection of a cleric and a reminder to him or her to include an uplifting, general message. Such interaction does not require that "a particular religion ... endure the ongoing presence of state personnel whose primary purpose is to monitor" prayer contents in "an attempt to guard against the infiltration of religious thought." *Aguilar v. Felton,* 473 U.S. 402, 413, 105 S.Ct. 3232, 3238, 87 L.Ed.2d 290 (1985). Nor does it necessitate frequent, pervasive or burdensome contacts between University officials and local clergy. Thus, because the degree of entanglement in the instant case is relatively minor when compared with other Establishment Clause cases, the court finds that plaintiffs have failed to satisfy any of *Lemon's* three prongs.

### III. CONCLUSION.

In sum, plaintiffs have not demonstrated that they are entitled to summary judgment under either the coercion test set forth in *Lee* or the traditional *Lemon* test. Indeed, like the legislative prayers approved in *Marsh,* or the "government declaration of Thanksgiving as a public holiday, [or the] printing of 'In God We Trust' on coins, [or] opening court sessions with 'God save the United States and this honorable court,' *Lynch,* 465 U.S. at 693, 104 S.Ct. at 1369, a short ecumenical prayer at a university graduation amounts to nothing more than "a tolerable acknowledgement of beliefs widely held among the people of this county." *Marsh,* 463 U.S. at 792, 103 S.Ct. at 3336. Plaintiffs' motion for summary judgment must therefore be denied.

Moreover, though defendants have not yet moved for summary judgment, the Court concludes that judgment should be immediately entered in their favor. The facts relied upon by the Court, including the age of the plaintiffs, the atmosphere and overwhelmingly secular nature of the ceremony, the briefness of the prayer, the unique role of the

University and the availability of alternative ceremonies, are undisputed. Defendants suggest that factual controversies relating to the feelings of awkwardness and distaste plaintiffs profess to have experienced during the ceremony preclude summary judgment in their favor. Such allegations of fact are uniquely unsuited to objective verification and, therefore, could not be the sole basis for requiring a trial. Whatever the intensity or sincerity of those feelings, however, they do not change the Court's legal analysis or conclusions.

Finally, this ruling on summary judgment is consistent with its conclusions and analysis in the order denying the motion for preliminary injunction. That order, therefore, is incorporated in this entry and, for all these reasons set forth above, plaintiffs' motion for summary judgment is DENIED.

It is so ORDERED.